**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

---------------------------------------------------------------------------X

**JACQUELINE BOTTEGA,**

**Plaintiff,**

**CIVIL ACTION**
**No. 04-323 (MML)(DLM)**

**v.**

**WILLIAM B. HALSTEAD,**
**EDGAR YACHT MANAGEMENT, INC., and**
**LOLA MARINE LTD.,**

**Defendants**

---------------------------------------------------------------------------X

**LOLA MARINE, LTD.,**

**Third-Party Plaintiff,**

**v.**

**J.W. KAEMPFER.**

**Third-Party Defendant.**

---------------------------------------------------------------------------X

**DECLARATION AND CERTIFICATION OF FRANCIS J. FLANAGAN IN SUPPORT OF THIRD-PARTY DEFENDANT J.W. KAEMPFER'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, <u>MOTION FOR SUMMARY JUDGMENT</u>**

1. I, FRANCIS J. FLANAGAN am a member in good standing of the Bar of this Court and a member of the firm of SAYER, REGAN, THAYER & FLANAGAN, attorneys for THIRD-PARTY DEFENDANT J.W. KAEMPFER (hereinafter referred to as "KAEMPFER"). I submit this affidavit and certification based on personal knowledge and documents in my files, in support of Third-Party Defendant J.W. Kaempfer's Motion To Dismiss For Judgment on the Pleadings or, in the alternative Motion For Summary Judgment on the grounds that the Plaintiff and Third-Party Plaintiff's Complaints asserting Jones Act and Unseaworthiness causes of action

are barred by the statute of limitation. I also submit this affidavit based upon the Report and Recommendation of Magistrate Judge Martin [Annexed as *Kaempfer Exhibit A*], the following facts are known to me:

2. This is an action pursuant to the Jones Act, 46 U.S.C. App. § 688 and the Court's admiralty and maritime jurisdiction. Plaintiff Jacqueline Bottega allegedly was injured on August 18, 2001, while employed as a member of the crew of S/V LOLA, owned by LOLA MARINE, LTD. *Bottega v. Halstead,* 2005 U.S. Dist. LEXIS 16627, *2 (D.R.I. 2005), *Kaempfer Exhibits A, B and C.*

3. Annexed as Exhibit B is a copy of Plaintiff's Complaint. That complaint alleges Jones Act negligence and unseaworthiness against the vessel owner and BOTTEGA's employer, LOLA MARINE.

4. Annexed as Exhibit C is a copy of Plaintiff's Amended Complaint. That amended complaint also alleges Jones Act negligence and unseaworthiness against the vessel owner and BOTTEGA's employer, LOLA MARINE.

5. In February 2001, plaintiff was hired as a stewardess by Robert Edgar, the captain of S/V LOLA. During the time she was employed as a member of the crew, plaintiff was paid by Defendant Edgar Yacht Management. *Bottega, supra,* 2005 U.S. Dist. *7, *Kaempfer Exhibit A*; Edgar Deposition Transcript, pages 98-100, line(s) 10-25; 1-25; and 1-6, annexed hereto as *Kaempfer Exhibit D* and Bottega Deposition Transcript, pages 126-127, line(s)13-25; and 1-6, annexed hereto as *Kaempfer Exhibit E.*

6. In July 2001, LOLA MARINE, LTD chartered the vessel to third party defendant J.W. KAEMPFER for the period August 10-20, 2001. *Bottega, supra, Kaempfer Exhibit A,*

Kaempfer Deposition Transcript, page 41, line(s) 13-16, annexed hereto as *Kaempfer Exhibit F; Kaempfer Exhibits G and H.*

7. Annexed as Exhibit G is a copy of the Yacht Charter Party Agreement.

8. Annexed as Exhibit H is a copy of the Yacht Employment Agreement.

9. Plaintiff filed her Complaint on July 28, 2004, naming Halstead, Edgar Yacht Management, and Lola Marine as Defendants. *Bottega, supra,* 2005 U.S. Dist. *13, *Kaempfer Exhibits A and B.*

10. Plaintiff alleged in her Amended Complaint that all three Defendants, William B. Halstead ("Halstead"), Lola Marine, and Edgar Yacht Management, employed her on August 18, 2001. *Bottega, supra,* 2005 U.S. Dist. *3, *Kaempfer Exhibit A and C.*

11. On August 2, 2005, LOLA impleaded KAEMPFER, after the July 21, 2005 decision of Magistrate Judge Martin, which estopped LOLA from arguing that it was not the plaintiff's employer. *Kaempfer Exhibit I.*

12. Annexed as Exhibit I is a copy of LOLA's Third-Party Complaint.

13. LOLA MARINE filed a third-party complaint, pursuant to Fed.R.Civ. P 14 (c), alleging that KAEMPFER was Plaintiff's Jones Act employer and not LOLA MARINE. (Doc. #53), *Kaempfer Exhibit I.* The complaint seeks indemnity and tenders defendant directly to plaintiff pursuant to Rule 14 (c) Fed. R. Civ. P.

14. LOLA MARINE subsequently amended the third-party complaint on January 20, 2006. (Doc. #57), annexed as *Kaempfer Exhibit J.* The amended complaint seeks indemnity and tenders defendant directly to plaintiff pursuant to Rule 14 (c) Fed. R. Civ. P.

Dated: February , 2006
Newport, Rhode Island

/s/ Francis J. Flanagan

1 of 1 DOCUMENT

**JACQUELINE BOTTEGA, Plaintiff, v. WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT, INC., and LOLA MARINE LTD., Defendants.**

**CA 04-323ML**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**2005 U.S. Dist. LEXIS 16627**

**July 21, 2005, Decided**

**COUNSEL:** [*1] For Jaqueline Bottega, Plaintiff: Charles S. Beal, Justin T. Shay, Cameron & Mittleman, Providence, RI; Gregory D. Bellantone, Paul B. Edelman, Edelman, Krasin, & Jaye, PLLC, Carle Place, NY.

For Edgar Yacht Management Inc., Defendant: Norman A. Peloquin, II, Norman A. Peloquin II, P.C., Adamsville, RI.

For Lola Marine Ltd., Defendant: Frederick A. Lovejoy, Providence, RI; John P. Walsh, Holland & Knight LLP, Providence, RI.

For Edgar Yacht Management Inc., Cross Claimant: Norman A. Peloquin, II, Norman A. Peloquin II, P.C., Adamsville, RI.

For Lola Marine Ltd., Cross Defendant: Frederick A. Lovejoy, Providence, RI; John P. Walsh, Holland & Knight LLP, Providence, RI.

**JUDGES:** David L. Martin, United States Magistrate Judge.

**OPINION BY:** DAVID L. MARTIN

**OPINION:**

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the court is Defendants Lola Marine Ltd. and William B. Halstead's Motion to Dismiss (Document ("Doc.") #22) ("Motion to Dismiss" or "Motion"). The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and D.R.I. Local R. 32(a). For [*2] the reasons stated herein, I recommend that the Motion to Dismiss be denied as to Lola Marine Ltd., but granted as to William B. Halstead.

**Overview**

This is an action brought pursuant to the Jones Act, n1 46 U.S.C. App. § 688, and the court's admiralty and maritime jurisdiction, see 28 U.S.C. § 1333. Plaintiff Jacqueline Bottega ("Plaintiff") was injured on August 18, 2001, while employed as a member of the crew of the S/V LOLA. See Amended Complaint PP 19, 23. At the time the vessel was in navigable waters in the state of Maine. See 28 U.S.C. 1746 Declaration of Jacqueline Bottega in Opposition to Defendants' Motion to Dismiss (Document #29) ("Bottega 12/15/04 Decl.") P 4. She makes claims for negligence, unseaworthiness, and maintenance and cure. See Amended Complant PP 25, 30, 35.

> n1 "The Jones Act provides that any seaman who shall suffer personal injury in the course of employment may maintain an action for damages at law . . . . The statute has been interpreted to require that a Jones Act defendant be the employer of the seaman." McAleer v. Smith, 818 F.Supp. 486, 492 (D.R.I. 1993) (internal quotation marks and citations omitted) (alteration in original) .

[*3]

The vessel was owned by Lola Marine Ltd. ("Lola Marine"). n2 See id. P 17. The identity of Plaintiff's employer on the date she was injured is a matter of dispute and more than a little confusion. Plaintiff alleged in her Amended Complaint that all three Defendants, William B. Halstead ("Halstead"), Lola Marine, and Edgar Yacht Management, employed her on August 18, 2001. See id. PP 20-22. In October of 2004, after the statute of limitations had run, Halstead and Lola Marine filed a motion which stated that from August 10, 2001, to August 20,

2001, the vessel was under a demise or bareboat n3 charter to J.W. Kaempfer ("Kaempfer") of London, England, and that Plaintiff was in the employ of Kaempfer and not Halstead or Lola Marine on August 18, 2001, the date she was injured. See Motion for Leave to File a Memorandum of Law, Exceeding 20 Pages, in Support of Defendants Lola Marine, Ltd. and William B. Halstead's Motion to Dismiss (Doc. #20) ("Motion for Leave") at 2. Prior to receiving this motion, Plaintiff's counsel had not received any communication from Lola Marine, its insurance carrier, or its attorney regarding the existence of a bareboat charter agreement. See [*4] 28 U.S.C. 1746 Declaration of Paul B. Edelman n4 ("Edelman Decl.") P 4.

n2 "It has has been settled law in this country since The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, decided in 1903, that an owner of a ship is liable to indemnify seamen in his employ for injuries caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment." Vitozi v. Balboa Shipping Co., 163 F.2d 286, 289 (1st Cir. 1947). "A plaintiff normally can bring an unseaworthiness claim only against the owner of a vessel." Cerqueira v. Cerqueira, 828 F.2d 863, 865 (1st Cir. 1987).

n3 Under a bareboat or demise charter the owner completely and exclusively relinquishes possession, command, and navigation to the charterer. See Brophy v. Lavigne, 801 F.2d 521, 523 (1st Cir. 1986); see also McAleer v. Smith, 57 F.3d 109, 112-113 (1st Cir. 1995); Stephenson v. Star-Kist Caribe, Inc., 598 F.2d 676, 679 (1st Cir. 1979). "It has long been recognized in the law-of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner pro hac vice." Reed v. Steamship Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963) (footnote omitted); see also Forrester v. Ocean Marine Indem. Co., 11 F.3d 1213, 1215 (5th Cir. 1993) ("In a demise charter, the vessel owner transfers full possession and control to the charterer, who in turn furnishes the crew and maintenance for the vessel (thus the term 'bareboat' ). Consequently, the bareboat charterer as a demise charterer is the owner *pro hac vice* of the vessel for the duration of the contract. The demise charterer is therefore responsible *in personam* for the negligence of the crew and the unseaworthiness of the vessel.").

[*5]

n4 The 28 U.S.C. 1746 Declaration of Paul B. Edelman ("Edelman Decl.") is Attachment ("Att.") 2 to the Memorandum of Law in Opposition to the Motion to Dismiss Plaintiff's Amended Complaint (Doc. #43) ("Plaintiff's Second Mem.").

By the instant Motion, Lola Marine and Halstead seek dismissal pursuant to Fed. R. Civ. P. 12(b) (1) for lack of subject matter jurisdiction. Alternatively, they move for dismissal under Rule 12(b) (6) for failure to state a claim upon which relief can be granted. The basis for dismissal is the same under either rule. They contend that on the date Plaintiff was injured the vessel was under bareboat charter to Kaempfer and that Kaempfer had hired the captain and crew, including Plaintiff, for the duration of the charter. See Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Mem.") at 3. Therefore, according to Halstead and Lola Marine, Plaintiff's employer on that date was Kaempfer, see id. at 6, and the claims against them should be dismissed, see id. at 1.

Plaintiff [*6] does not concede that the vessel was under bareboat charter on August 18, 2001. See Memorandum of Law in Opposition to Defendant's [sic] Motion to Dismiss ("Plaintiff's Mem.") at 4-8. However, Plaintiff also argues that even if the vessel were under such charter Lola Marine should be estopped from denying that it was Plaintiff's employer on that date. See Memorandum of Law in Opposition to the Motion to Dismiss Plaintiff's Amended Complaint (Doc. #43) ("Plaintiff's Second Mem.") at 4-8.

Because I find that a trier of fact could conclude that Lola Marine is estopped from denying that it was Plaintiff's employer on the date she was injured, I recommend that the Motion be denied as to Lola Marine. Since Plaintiff has agreed to discontinue all claims against Halstead, I recommend that the Motion be granted as to him. See Tape of 2/22/05 hearing; see also Plaintiff's Mem. at 10 n5 ("the plaintiff agrees to discontinue all claims against defendant [] Halstead individually").

n5 Plaintiff's Memorandum of Law in Opposition to Defendant's [sic] Motion to Dismiss ("Plaintiff's Mem.") is not paginated. The court has assigned page numbers. Page 1 is the first page after the Table of Authorities.

[*7]

**Facts and Travel**

In February 2001, Plaintiff was hired as a stewardess by Robert Edgar ("Captain Edgar"), the captain of the

S/V LOLA. See Bottega 12/15/04 Decl. P 1. During the time she was employed as a member of the crew, Plaintiff was paid by Defendant Edgar Yacht Management. See id. P 3. Payment was made by direct deposits into Plaintiff's checking account with a New York bank. See id.; id., Exhibit ("Ex.") A (credit advices reflecting two payments of $ 2,500.00 and one of $ 3,000.00 by Edgar Yacht Management to Plaintiff). Plaintiff never received a W-2 form or 1099 form from any entity with regard to the wages she was paid during her employment on the S/V LOLA. See 28 U.S.C. 1746 Further Declaration of Jacqueline Bottega in Opposition to Defendants' Motion to Dismiss ("Bottega 3/9/05 Decl.") P 2.

In July 2001, Lola Marine chartered the vessel to Kaempfer for the period August 10-20, 2001. See 28 U.S.C. §1746 Declaration of William B. Halstead in Support of Defendants' Motion to Dismiss (Doc. #23) ("Halstead Decl."), Ex. A (Yacht Charter Agreement). The Yacht Charter Agreement stated that during the period [*8] of the charter the captain and crew of the vessel were employees of Kaempfer and not Lola Marine. See id. P 11. Kaempfer also executed a Yacht Employment Agreement whereby he agreed to hire Captain Edgar for the charter period. See Halstead Decl., Ex. B (Yacht Employment Agreement) P 1. The Yacht Employment Agreement additionally referenced the hiring of two additional crew members, but only Captain Edgar's name was written in the space provided for identifying the crew. See id. P 2. The lines for identifying the "Chef" and "Mate/Stew" were left blank. See id. Although Plaintiff witnessed Captain Edgar's signature on the Yacht Employment Agreement, see id., she states that she did not read it and did not know its contents, see Bottega 12/15/04 Decl. P 5.

According to Plaintiff, after she was injured on August 18, 2001, Captain Edgar told her that Lola Marine's insurance carrier, Atlantic Mutual Insurance Company ("Atlantic Mutual"), would be responsible for making payments for her maintenance and cure. See Bottega 3/9/05 Decl. P 3. In apparent confirmation of this statement, shortly thereafter Atlantic Mutual began making payments to Plaintiff for her maintenance [*9] and cure. See Bottega 12/15/04 Decl. P 4; id., Ex. B at 2 (reflecting maintenance payment of $ 1,075.00 by Atlantic Mutual on 9/25/01). Atlantic Mutual continued to make payments to Plaintiff, or for her benefit, until February of 2005. See id., Ex. B at 2; Bottega 3/9/05 Decl. P 5. These payments total approximately $ 40,000.00. See 28 U.S.C. §1746 Statement of Mark Smieya ("Smieya 3/30/05 Statement") P 8.

Lola Marine maintains that the payments by its insurer, Atlantic Mutual, were mistakenly made. See Reply Memorandum of Law of Defendants William B. Halstead and Lola Marine, Ltd. (Document #34) ("Defendants' Reply") at 6-7; id., Ex. A (28 U.S.C. §1746 Statement of Mark Smieya ("Smieya 1/20/05 Statement")) PP 6-7, 9. According to Lola Marine, Atlantic Mutual was unaware until the late summer of 2004 of the bareboat charter to Kaempfer and erroneously believed up until that time that Plaintiff was employed by Halstead. See Defendant Lola Marine Ltd.'s Brief in Response to the Questions Stated in the Court's Scheduling and Briefing Order, Dated April 20, 2005 (Docket No. 46) (Doc. #49) ("Lola Marine's Response [*10] Brief") at 2.

Further confusing matters, up until at least July 9, 2004, Atlantic Mutual (or its agents) identified Atlantic Mutual's insured as Halstead (not Lola Marine) in communications to Plaintiff, her attorneys, and other entities. See Plaintiff's Second Mem., Attachment ("Att.") 3 (Fax from Smieya to Krasin of 7/1/03); id., Att. 8 (Letter from Smieya to Varughese of 5/24/04); id., Att. 9 (Letter from Nixon to Edelman of 7/9/04); see also Bottega 12/15/04 Decl., Ex. B (six documents). However, the named insured on the policy of marine insurance pursuant to which Atlantic Mutual made payments to Plaintiff was not Halstead but Lola Marine. See 28 U.S.C. §1746 Statement of Frederick A. Lovejoy ("Lovejoy 1/21/05 Statement") P 4.

According to Lola Marine and Halstead, Plaintiff was never employed by either of them. See Defendants' Mem. at 3 (citing Halstead Decl. P 12). They contend that Edgar Yacht Management hired and paid the crew. See id. However, Edgar Yacht Management claims that Plaintiff was employed by Lola Marine, see Answer and Cross-Claim of Edgar Yacht Management, Inc. (Doc. #17), at 7 ("At all times material [*11] hereto, plaintiff, Jacqueline Bottega, was in the employ of Lola [Marine] as a member of the crew of the vessel LOLA ...."), and denies that it was Plaintiff's employer for purposes of recovery under the Jones Act, see id.

On May 23, 2003, an attorney representing Plaintiff, Lawrence P. Krasin ("Attorney Krasin") of Edelman, Krasin & Jaye, P.L.L.C. ("Edelman, Krasin & Jaye"), sent a letter to Atlantic Mutual regarding Plaintiff's claim. See Edelman Decl. P 1; Plaintiff's Second Mem., Att. 3 (Fax from Smieya to Krasin of 7/1/03). The claims examiner handling Plaintiff's claim, Mark Smieya ("Mr. Smieya"), responded to the letter in a fax dated July 1, 2003. Central to the court's finding regarding estoppel and determination of the instant Motion relative to Lola Marine, Mr. Smieya's fax stated in part:

> **Ms. Bottega was a Jones Act Seaman at the time of her employment with our insured.** Ms. Bottega's claim is being handled under our insured's yacht policy.

> We have made maintenance payments to Ms. Bottega and have paid her medical bills regarding her shoulder injury. Ms. Bottega will be reaching maximum medical cure shortly at which time our obligation to her [*12] under the Jones Act will cease.

Plaintiff's Second Mem., Att. 3 (bold added).

At some point thereafter Atlantic Mutual closed Plaintiff s case, but agreed to reopen it on January 23, 2004, at the request of Attorney Justin Varughese ("Attorney Varughese") of Edelman, Krasin & Jaye. See Plaintiff's Second Mem., Att. 4 (Letter from Varughese to Smieya of 1/23/04) at 1. Attorney Varughese sent a letter to Mr. Smieya, confirming the agreement to reopen the claim and requesting that Mr. Smieya provide information regarding the insurance policy, including the effective dates and nature of the coverage under such agreement. See Plaintiff's Second Mem., Att. 4 at 2.

On May 24, 2004, Mr. Smieya sent a letter to Attorney Varughese, advising that Constitution State Services had been hired by Atlantic Mutual to handle Atlantic Mutual's marine division claims, including Plaintiff's claim. Plaintiff's Second Mem., Att. 8 (Letter from Smieya to Varughese of 5/24/04). The letter noted that Atlantic Mutual had not yet received a demand letter from Plaintiff's counsel, although one had previously been requested. See id. Mr. Smieya advised that the demand letter "should also include [*13] proof of the theory of negligence being alleged against our insured and any documentation to back up Ms. Bottega's demand." Id. Mr. Smieya further stated that "we will hold our file in abeyance awaiting your demand letter." Id.

Plaintiff filed her Complaint on July 28, 2004, naming Halstead, Edgar Yacht Management, and Lola Marine as Defendants. See Complaint (Doc. #1); see also Docket. Plaintiff alleged that she was an employee of Halstead and Edgar Yacht Management on August 18, 2001. See Complaint PP 20-21. On August 4, 2004, Attorney Edelman sent a courtesy copy of the Complaint to the Walters Nixon Group, Inc. ("Walters Nixon"), which had taken over the handling of Plaintiff's claim from Constitution State Services. See Plaintiff's Second Mem., Att. 20 (Letter from Edelman to Nixon of 8/4/04); id., Att. 9 (Letter from Nixon to Edelman of 7/9/04).

On August 16, 2004, two days before the statute of limitations expired, see McKinney v. Waterman S.S. Corp., 925 F.2d 1, 2 n.2 (1st Cir. 1991) (noting three-year statute of limitations for Jones Act and general maritime law claims), Atlantic Mutual learned of the bareboat charter to Kaempfer [*14] and that Plaintiff was allegedly in the employ of Kaempfer from August 10 to August 20, 2001, n6 see Smieya 1/20/05 Statement M 6-7. Atlantic Mutual did not notify Plaintiff or her counsel of this information, see Tape of 2/22/05 hearing, and Plaintiff's counsel did not learn of it until on or about October 14, 2004, when they received a copy of the Motion for Leave (Doc. #20), see Edelman Decl. P 4; see also Motion for Leave at 2 (stating such information).

> n6 Mr Smieya states that Atlantic Mutual did not learn of the bareboat charter "until August 2004," Smieya 1/20/05 Statement P 6, and "that upon learning the fact that Jacqueline Bottega was in the employ of charterer J.W. Kaempfer from August 10 to August 20, 2001, Ms. Christine E. Butler of Marsh advised me via e-mail on August 16, 2004, that she was notifying Royal & Sun Alliance Insurance Company, the charterer's protection and indemnity underwriter of Ms. Bottega's claim," id. P 7. Mr. Smieya does not further identify "Marsh" in either this, ***see id.***, or his subsequent statement, see 28 U.S.C. §1746 Statement of Mark Smieya ("Smieya 3/30/05 Statement") P 4.

[*15]

On August 17, 2004, the day prior to expiration of the statute of limitations, Halstead's and Lola Marine's attorney, Frederick A. Lovejoy ("Attorney Lovejoy"), requested from Plaintiff's attorneys a pro forma thirty day extension of time within which to answer, move, or otherwise respond to Plaintiff's Complaint. See 28 U.S.C. §1746 Statement of Frederick A. Lovejoy ("Lovejoy 3/30/05 Statement") P 5. At the time Attorney Lovejoy made this request, he was unaware that Plaintiff's counsel had filed an Amended Complaint on August 17, 2004, thus extending the time Defendants had to answer. See id. P 6. A stipulation was subsequently filed which allowed Defendants Halstead and Lola Marine an additional thirty days, up to and including September 16, 2004, to respond to the Complaint. See Stipulation for Extension of Time within which to Respond to the Complaint (Doc. #9).

On September 15, 2004, Attorney Lovejoy sought an additional extension of time to and including October 5, 2004, in which Defendants Halstead and Lola Marine could answer, move, or otherwise respond to Plaintiff's Complaint. See Lovejoy 3/30/05 Statement P 8; Defendants [*16] William B. Halstead and Lola Marine, Ltd.'s Motion on Consent for an Extension of Time to and Including October 5, 2004[,] in which to Answer, Move or Otherwise Respond to the Plaintiff's Complaint (Doc. #14). Thereafter, on October 4, 2004, Attorney Lovejoy requested another extension of time to and including

October 19, 2004. See Defendants William B. Halstead and Lola Marine, Ltd.'s Motion on Consent for a Second Extension of Time from October 5, 2004[,] to and including October 19, 2004[,] in which to Answer, Move or Otherwise Respond to the Plaintiff's Complaint (Doc. #18). n7

n7 While this was the second extension sought via a motion on consent, counting the August 17, 2004, Stipulation (Doc. #9), it was the third extension of the time for Halstead and Lola Marine to answer, move or otherwise respond to the action.

In a declaration filed in connection with the instant Motion, Attorney Lovejoy does not indicate exactly when he learned that the S/V LOLA was under bareboat charter on August 18, 2001. [*17] See Lovejoy 3/30/05 Statement PP 9-11. He states that he was assigned the matter on August 17, 2004, see id.; that he received the file from Constitution State Services on August 19, 2004, see id.; that after receiving the second extension (up to and including October 5, 2004), see id. P 8, he "conducted an investigation into the allegation that the S/V LOLA was on a J.W. Kaempfer bareboat charter on August 18, 2001," id. P 9; and that he obtained a copy of the bareboat charter and the Yacht Employment Agreement on September 30, 2004, see id. P 11. How Attorney Lovejoy learned of this "allegation" or from what source is not addressed in his declaration. See Lovejoy 3/30/05 Statement. He affirms, however, that he "did not attempt to purposely deprive plaintiff Jacqueline Bottega of any claim ...." Id. P 18.

Defendants Halstead and Lola Marine filed the instant Motion to Dismiss on October 22, 2004. See Motion; see also Docket. On December 20, 2004, Plaintiff's objection was filed. n8 See Objection to Motion to Dismiss (Doc. #28) ("Objection"). Thereafter, Halstead and Lola Marine sought and [*18] were granted two extensions of time within which to file a reply memorandum. See Docs. #30, 31, 32, 33. n9 The reply memorandum was filed on January 26, 2005. See Defendants' Reply. That same date Plaintiff filed a partial opposition to Defendants' second request for extension. See Partial Opposition to Motion on Consent (Doc. #35) ("Plaintiff's Partial Opposition"). By the opposition, Plaintiff sought leave to file a sur-reply memorandum if the court considered certain new arguments or evidence which Plaintiff believed Defendants intended to include in their reply. See id. P 4. Plaintiff's Partial Opposition was referred to this Magistrate Judge for determination. See Docket entry for 2/11/05.

n8 In the interest of brevity, hereafter the court does not recount all the extensions which were requested by the parties in connection with the instant Motion.

n9 The motions seeking these extensions have prolix titles. See, e. q., Motion on Consent for: 1) an Extension of Time to and Including February 1, 2005 [,] in which to File a Reply to Jacqueline Bottega's Opposition to Defendants' Motion to Dismiss, Dated December 17, 2004, to Defendants William B. Halstead and Lola Marine, Ltd.'s Motion to Dismiss, and 2) to File a Reply Brief in Excess of the Five (5) Page Limit Contained in General Order #2002-01 No.2 (Doc. #32) ("Defendants' 1/20/05 Motion on Consent"). Consequently, the court identifies these motions in the text by document numbers and not by title.

[*19]

On February 22, 2005, the court conducted a hearing on the Motion to Dismiss and on Plaintiff's Partial Opposition. See Docket. During the hearing, Plaintiff's counsel agreed to the dismissal of all claims against Halstead. See Tape of 2/22/05 hearing; see also Plaintiff's Mem. at 10 (stating that Plaintiff "agrees to discontinue all claims against defendant [] Halstead individually").

Plaintiff's counsel argued that Lola Marine had failed to establish that the S/V LOLA was under a demise or bareboat charter on the date of Plaintiff's injury. See Tape of 2/22/05 hearing; see also Plaintiff's Mem. at 4-8. Plaintiff's counsel also contended that Lola Marine's insurer, Atlantic Mutual, had affirmatively represented in writing to him that it was Plaintiff's Jones Act employer and that Lola Marine had not informed him of the existence of the bareboat charter until after the statute of limitations had run. See Tape of 2/22/05 hearing. Because of this, Plaintiff's counsel argued that Lola Marine should be estopped from denying that it was Plaintiff's employer on August 18, 2001, and requested permission to file a memorandum addressing the estoppel issue. See [*20] id. Lola Marine's counsel opposed this request, noting that Plaintiff could have raised estoppel in its original response to the Motion. See id.

The court took both motions under advisement and indicated that it would rule shortly on Plaintiff's Partial Opposition, either granting or denying Plaintiff's request to file a sur-reply memorandum. See id. The following day, February 23, 2005, the court issued an order, granting Plaintiff's request that she be allowed to file a memorandum regarding estoppel and allowing Lola Marine thereafter to file a response. See Order Granting in Part Plaintiff's Partial Opposition to Motion on Consent (Doc.

#38) ("Order of 2/23/05"). In the Order of 2/23/05, the court recounted the facts (all of which have been stated in this Report and Recommendation) which caused it to grant Plaintiff's request. See Order of 2/23/05 at 1-3. The court found that those facts were sufficient to raise the issue of estoppel in this action. See id. at 3-4 (citing Garcia v. Peter Carlton Enters., 717 F.Supp. 1321, 1326 (N.D. Ill. 1989) ("Estoppel principles ordinarily apply in cases in which a defendant knowingly allows [*21] or actually misleads a plaintiff into thinking it has sued the proper entity and the defendant appears ready to defend itself, but after the statute of limitations runs the defendant suddenly claims it is not the party to be sued."); Conradi v. Boone, 316 F.Supp. 918, 921 (S.D. Iowa 1970) (finding that plaintiffs' claim of equitable estoppel presented genuine issues as to certain material facts and that a trier of fact could conclude that defendants were estopped from asserting the bar of the statute of limitations based on conduct of one of defendants' insurers)).

On March 16, 2005, Plaintiff filed her memorandum regarding estoppel. See Plaintiff's Second Mem. (Doc. #43). Lola Marine filed its reply memorandum on April 1, 2005. See Defendant's Reply Memorandum in Support of Motion to Dismiss (Doc. #44) ("Lola Marine's Reply"). After receiving these memoranda, the court issued a Scheduling and Briefing Order (Doc. #46), setting May 11, 2005, as the date for a hearing on the question of whether Lola Marine "should be estopped from asserting any defense that it was not Plaintiff's employer." Scheduling and Briefing Order at 1. The court also directed Lola Marine [*22] and Plaintiff to address certain questions which were posed in the order. See id. at 1-3.

Lola Marine sought and was granted a continuance of the May 11, 2005, hearing, which was rescheduled for June 8, 2005. See Motion on Consent for Rescheduling of the Hearing Presently Scheduled for May 11, 2005 [,] at 2:00 P.M. (Doc. #47); Order Granting Motion to Reschedule Hearing (Doc. #48). On May 9, 2005, Lola Marine filed its response to the questions posed in the Scheduling and Briefing Order of April 20, 2005. See Lola Marine's Response Brief (Doc. #49). Plaintiff's response to these questions was filed on May 19, 2005. See Plaintiff's Memorandum in Response to the Questions Put Forth by the Court in the Briefing and Scheduling Order of April 20, 2005 (Doc. #50).

On June 8, 2005, the court conducted a further hearing on the Motion and heard arguments regarding estoppel. See Tape of 6/8/05 hearing. Thereafter, the court took the Motion under advisement.

**Standard of Review**

The Motion seeks dismissal pursuant to Rule 12(b)(1) and, alternatively. Rule 12(b)(6). A trial court may consider extrinsic materials in passing upon a motion to dismiss pursuant to Rule [*23] 12(b)(1) without converting it into a motion for summary judgment. See Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000); see also Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002) ("While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion.").

When matters outside the pleadings are considered by the court in passing upon a motion to dismiss pursuant to Rule 12(b)(6), the motion is to be treated as one for summary judgment. See Fed. R. Civ. P. 12(b). Although the court did not expressly state that to the extent the Motion seeks dismissal pursuant to Rule 12(b)(6) it would be treated as a motion for summary judgment, Lola Marine has suffered no prejudice because the summary judgment standard is more favorable to Lola Marine than the Rule 12(b)(6) standard. See Burrell v. Hampshire County, 307 F.3d 1, 9 (1st Cir. 2002) (noting the more lenient standard for dismissal of claims under Rule 12(b)(6) in comparison to summary judgment). Furthermore, Lola Marine [*24] received copies of the materials outside of the pleadings, it has had the opportunity to respond to them, and it has not controverted the accuracy of the documents from its insurer n10 which give rise to Plaintiff's claim of estoppel. Cf. Maldonado v. Dominguez, 137 F.3d 1, 5-6 (1st Cir. 1998) (stating the "Moody exception" to the rule that the district court must notify parties of an intent to convert a 12(b)(6) motion to a motion for summary judgment: "when a district court fails to give express notice to the parties of its intention to convert a 12(b)(6) motion into a motion for summary judgment, there is no reversible error if the party opposing the motion (1) has received materials outside the pleadings, (2) has had an opportunity to respond to them, and (3) has not controverted their accuracy.") (citing Moody v. Town of Weymouth, 805 F.2d 30, 31 (1st Cir. 1986)). Accordingly, the court applies the standard for summary judgment.

n10 Those documents are: the July 1, 2003, fax from Mr. Smieya to Attorney Krasin, the May 24, 2004, letter from Mr. Smieya to Attorney Varughese, and the July 9, 2004, letter from Ms. Nixon to Attorney Edelman.

[*25]

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kearney v. Town of Wareham, 316 F.3d 18, 21 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). "'A

dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing [*26] Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). "When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "summary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991) (citation and internal quotation marks omitted).

**Determinative Issue**

Lola Marine contends that the S/V LOLA was under bareboat charter at the time of Plaintiff's injury and that the charterer, Kaempfer, employed the crew, including Plaintiff, and assumed all of the owner's obligations for negligence under the Jones Act and for maintenance and cure and for unseaworthiness under the general maritime law. See Defendants' Mem. at [*27] 4-9. Consequently, according to Lola Marine, no factual predicate exists to support subject matter jurisdiction over any of Plaintiff's claims, and they should be dismissed pursuant to Fed. R. Civ. P. Rule 12(b)(1). See id. at 10-13. Alternatively, Lola Marine seeks dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. See id. at 13-15.

For the purpose of deciding the instant Motion, the court finds it unnecessary to determine whether the vessel was under bareboat charter on the date Plaintiff was injured and whether the charterer assumed all of the obligations of Lola Marine for negligence under the Jones Act, and for maintenance and cure and for unseaworthiness under the general maritime law. n11 This is because a trier of fact could conclude from the evidence in the record that Lola Marine is estopped from denying that it was Plaintiff's employer under the Jones Act and under general maritime law. Cf. Schrader v. Royal Caribbean Cruise Line, Inc., 952 F.2d 1008, 1014 (8th Cir. 1991) (reversing grant of summary judgment and finding that the estoppel issue presented a triable [*28] question of fact where reasonable persons could differ as to whether defendant corporation actually misled plaintiff and as to whether plaintiff was sufficiently diligent to deserve the benefit of equitable estoppel); Conradi v. Boone, 316 F.Supp. 918, 921 (S.D. Iowa 1970) (denying motion for summary judgment where court found that plaintiff's claims of estoppel presented genuine issues as to certain material facts and that a trier of fact could conclude that defendants were estopped from asserting statute of limitations bar). The reasons the court reaches this conclusion are explained below.

n11 Although the court has concluded that it need not determine whether the S/V LOLA was under bareboat charter on the date Plaintiff was injured and whether as a result of that charter Plaintiff was on that date an employee of Kaempfer, the court observes that the two documents which Lola Marine cites as proof of the charter and of Plaintiff's status as an employee of Kaempfer, the Yacht Charter Agreement and the Yacht Employment Agreement, do not identify Plaintiff as part of the crew. In fact, Plaintiff's name is conspicuously absent from the Yacht Charter Agreement which states that "the crew shall comprise of the following: Captain: Robert Edgar Chef: Mate/ Stew: ." Yacht Employment Agreement P 2.

[*29]

**Equitable Estoppel**

Equitable estoppel is a judicially-devised doctrine which precludes a party to a lawsuit, because of some improper conduct on that party's part, from asserting a claim or a defense, regardless of its substantive validity. Courts invoke the doctrine when "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it" acts to his or her detriment. Restatement (Second) of Torts § 894(1) (1977).

Thus, the party claiming the estoppel must have re-

> lied on its adversary's conduct "in such a manner as to change his position for the worse," and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading. See Wilber National Bank v. United States, 294 U.S. 120, 124-125, 55 S.Ct. 362, 364, 79 L.Ed. 798 (1935).

Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59, 104 S.Ct. 2218, 2223-24, 81 L.Ed.2d 42 (1984).

Phelps v. Fed. Emergency Mgmt. Agency, 785 F.2d 13, 16 (1st Cir. 1986); [*30] see also Falcone v. Pierce, 864 F.2d 226, 228 (1st Cir. 1988) ("The traditional elements of equitable estoppel are first, a material misrepresentation of a party who had reason to know of its falsity; second, reasonable reliance upon the misrepresentation; and third, some disadvantage to the party seeking to assert estoppel fairly traceable to the misrepresentation."); Oxford Shipping Co. v. New Hampshire Trading Corp., 697 F.2d 1, 4 (1st Cir. 1982) ("Traditionally, the doctrine of equitable estoppel operates to preclude a party [who has made representations of fact through his words or conduct] 'from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right . . . .'") (quoting Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n, 620 F.2d 900, 908 (1st Cir.1980) (quoting 2 J. Pomeroy, Equity Jurisprudence § 804, at 1421-22 (3d ed. 1905))) (alterations in original).

"It is not necessary that the representations and conduct [*31] should be labelled [sic] as fraudulent in a strict legal sense or that they were made or carried on with an intention to mislead the plaintiff." Bergeron v. Mansour, 152 F.2d. 27, 30 (1st Cir. 1945); accord Clauson v. Smith, 823 F.2d 660, 663 n.3 (1st Cir. 1987) ("For an estoppel to arise, 'it is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by [his] conduct to induce delay.'") (quoting Bomba v. W.L. Belvidere, Inc., 579 F.2d 1067, 1071 (7th Cir.1978))(alteration in original). A person "may be 'estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.'" Clauson v. Smith, 823 at 662 (quoting Bergeron, 152 F.2d at 30).

> By their very character, claims of estoppel tend to be case-specific. The nature of the representations and of the conduct of the defendant are of crucial significance in determining whether the plaintiff is to be allowed to invoke this equitable principle . . . . Some definite, unequivocal [*32] behavior must be shown--conduct fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security. Equally, it must be demonstrated that the party seeking to enforce an estoppel relied to his detriment on the interdicted behavior.

Clauson v. Smith, 823 F.2d 660, 663 (1st Cir. 1987).

**Application of Law to Facts**

A trier of fact could find that the elements required for traditional estoppel are present in this case. Plaintiff claims that Mr. Smieya told her that she was employed by Atlantic Mutual's insured. See Bottega 3/9/05 Decl. P 4. Since Atlantic Mutual's insured was Lola Marine, see Lovejoy 1/21/05 Statement P 4, Mr. Smieya's statement, if made, constituted a definite misrepresentation of fact. It is undisputed that Mr. Smieya made the same statement in his July 1, 2003, fax to Attorney Krasin. See Plaintiff's Second Mem., Att. 3 ("Ms. Bottega was a Jones Act Seaman at the time of her employment with our insured."). Additionally, Attorney Edelman claims that Mr. Smieya and Nancy Nixon made the same or similar statements during conversations which they had with him regarding settlement of Plaintiff's [*33] claims. n12 See Edelman Decl. P 2 ("I was told, by the insurance carrier's representatives, that defendant, Lola Marine Ltd., was Ms. Bottega's Jones Act employer with regard to the injuries she sustained on August 18, 2001 . . . ."); id. P 3 ("As late as July 9, 2004[,] I spoke with Nancy Nixon with regard to this claim. At that time Ms. Nixon acknowledged that the insured was Ms. Bottega's Jones Act employer . . . .").

n12 Mr. Smieya disputes that he told Attorney Edelman that Lola Marine was Plaintiff's Jones Act employer with regard to the injuries she sustained on August 18, 2001. See 28 U.S.C.

§1746 Statement of Mark Smieya ("Smieya 3/30/05 Decl.") P 5 ("That I at no time told Jacqueline Bottega or her attorneys that Jacqueline Bottega was employed by Lola Marine, Ltd."). The Smieya 3/30/05 Decl. is attached as an exhibit to Lola Marine's Reply (Doc. #44). No affidavit has been submitted from Ms. Nixon, disputing the statements attributed to her regarding the identity of Plaintiff's employer. In any case, the fact that Lola Marine appears to dispute the oral statement attributed to Mr. Smieya does not prevent the court from considering it for purposes of deciding the instant Motion.

[*34]

A trier of fact could find that Lola Marine's insurer, Atlantic Mutual, had at least three reasons to believe that . Plaintiff would rely upon the statements that she was employed by its insured. First, the alleged oral statements were made by Atlantic Mutual's agents, Mr. Smieya and Ms. Nancy Nixon of Walters Nixon, to Plaintiff or Plaintiff's counsel. See Bottega 3/9/05 Dec. P 4; Edelman Decl. PP 2-3. Second, the written statements, see Plaintiff's Second Mem., Att. 3, 8, 9, which are apparently undisputed, were sent to Plaintiff's counsel. Third, Atlantic Mutual made payments to Plaintiff from September 2001 to at least October 2004 n13 in apparent conformity with (and seeming confirmation of) these oral and written statements. See Bottega 3/9/05 Decl. P 5; see also Bottega 12/15/04 Decl., Ex. B at 2; cf. Dillon v. Admiral Cruises, Inc., 960 F.2d 743, 745-746 (8th Cir. 1992) (finding that, where defendant had voluntarily paid plaintiff's medical bills, reasonable persons could differ as to whether defendant misled plaintiff regarding her legal situation such that defendant would should be estopped from asserting time limitation to bar suit).

n13 The court uses "October 2004" here (as opposed to February 2005) because after October Plaintiff was on notice that Lola Marine disputed that it was her Jones Act employer.

[*35]

Plaintiff's reliance upon these statements could be found reasonable by a trier of fact for the same reasons. In addition, the following circumstances weigh in favor of a finding of reasonableness.

Plaintiff alleges that she was hired as a stewardess, see Bottega 3/9/05 Decl. P 1, a position which would not require familiarity with the legal ramifications of a bareboat charter. Plaintiff has affirmed that she neither read nor knew the contents of the Yacht Employment Agreement which she witnessed. See Bottega 12/15/04 Decl. P 5. Plaintiff has declared that she was not aware of what it meant for a vessel to be under a bareboat charter, that Captain Edgar never advised her that during the time of the charter she was an employee of Kaempfer, that she never entered into an employment agreement with Kaempfer, that Kaempfer never informed her that he was her employer during the course of the charter, that she never consented to be employed by Kaempfer, that she never received any salary from Kaempfer, and that she never received a W-2 Form or a 1099 Form reflecting wages paid to her by Kaempfer. See Bottega 3/9/05 Decl. P 2.

Following her injury, Plaintiff was allegedly advised [*36] by Captain Edgar that Lola Marine's insurance carrier, Atlantic Mutual, would be responsible for making payments for her maintenance and cure. See id. P 3. On January 23, 2004, her attorneys requested a copy of Atlantic Mutual's file associated with Plaintiff's claim and information about the insurance policy pursuant to which payments were being made. See Plaintiff's Second Mem., Att. 4. Despite this request, Plaintiff's attorneys never received any communication or correspondence from Lola Marine, its insurance carrier, or its attorney regarding the existence of a bareboat charter prior to receiving Halstead's and Lola Marine's motion to file a brief in excess of twenty pages on or about October 14, 2004. See Edelman Decl. P 4. Plaintiff has declared that she did not know until October 15, 2004, when her attorney was notified of the bareboard charter, that Lola Marine disputed that it was Plaintiff's employer on August 18, 2001. See Bottega 3/9/05 Decl. P 6; Edelman Decl. P 4.

Although Plaintiff was hired by Captain Edgar and received payments from Edgar Yacht Management, see Bottega 12/15/04 Decl., Ex. A (credit advices reflecting two payments of $ 2,500.00 [*37] and one of $ 3,000.00 to Plaintiff), the significance of these facts are substantially diminished by the statements which were allegedly made to Plaintiff after her injury by Captain Edgar and by the representatives of Atlantic Mutual. It is also diminished by the failure of Edgar Yacht Management to provide Plaintiff with a W-2 or 1099 form. Thus, in light of all of the above described circumstances, a reasonable finder of fact could conclude that Plaintiff did not know, nor should she have known, that Atlantic Mutual's statements that she was employed by its insured, Lola Marine, were misleading.

Turning to the final element required for traditional estoppel, a trier of fact could also find that Plaintiff acted to her detriment by relying upon Atlantic Mutual's statement that she was employed by its insured, Lola Marine. By the time her counsel was informed by Lola Marine's counsel that the S/V LOLA was under a demise charter to Kaempfer and that Kaempfer was her employer on the

date she was injured, the statute of limitations had expired. See Motion for Leave (Doc. #20); Bottega 3/9/05 Decl. P 6.

**Lola Marine's Arguments**

Lola Marine makes four arguments in opposition [*38] to Plaintiff's contention that it should be equitably estopped from denying that it was Plaintiff's employer on August 18, 2001. See Lola Marine's Reply at 1-10. First, Lola Marine correctly notes that equitable estoppel is "extraordinary relief" which will not be applied unless the equities are clearly balanced in favor of the party seeking relief, see id. at 2 (quoting Southex Exhibitions, Inc. v. Rhode Island Builders Assoc., 279 F.3d 94, 104 (1st Cir. 2002)), and that the party relying upon estoppel has the burden of proving it, see id. (citing Rivera-Gomez v. de Castro, 900 F.2d 1, 3 (1st Cir. 1990)). Lola Marine asserts that Plaintiff "is 'several bricks short of the required load ....'" Lola Marine's Reply at 2 (quoting Rivera-Gomez v. de Castro, 900 F.2d at 3). However, all that Plaintiff must do at this juncture is demonstrate that a trier of fact could reasonably find that Lola Marine should be estopped from denying that it was Plaintiff's Jones Act employer on August 18, 2001. Plaintiff has made this showing.

In the course of this initial argument, Lola Marine cites an unpublished First Circuit opinion for the [*39] proposition that "the party to be estopped must have had an 'improper purpose' or 'constructive knowledge that its conduct was deceptive' [Romero-Villanueva v. Puerto Rico Elec. Power Auth., 112 Fed Appx. 74,] 78 [2004 U.S. App. LEXIS 21350 (1st Cir. Oct. 14, 2004)]." Even if the court were to overlook the fact that this opinion is unpublished n14 and that the proposition urged by Lola Marine appears to be at odds with language in Clauson v. Smith, 823 F.2d 660, 663 n.3 (1st Cir. 1987) ("For an estoppel to arise, it is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by his conduct to induce delay.") (alteration in original) (internal quotation marks omitted), and Bergeron v. Mansour, 152 F.2d 27, 30 (1st Cir. 1945) ("It is not necessary that the representations and conduct . . . be . . . made or carried on with an intention to mislead the plaintiff."), a reasonable trier of fact could find that Lola Marine had constructive knowledge that the statements and conduct of its agent and insurer, Atlantic Mutual, relative to Plaintiff and her attorneys, were deceptive. Although [*40] Lola Marine suggests that Atlantic Mutual did not "deceitfully misguide Plaintiff," Lola Marine's Reply at 2 (citing Rivera-Gomez v. de Castro, 900 F.2d 1, 3 (1st Cir. 1990)), because it was "never aware of the entire [panoply of relevant] facts until the statute of limitations expired; i.e., it was not able to procure a copy of the bareboat charter with J.W. Kaempfer until September 30, 2004," Lola Marine's Reply at 2 (quoting Rivera-Gomez v. Castro, 900 F.2d at 3) (alteration in original) (internal quotation marks omitted), Lola Marine's focus is misdirected. The party Plaintiff is seeking to estop is Lola Marine, not Atlantic Mutual. It is Lola Marine's knowledge which counts in determining whether the conduct of its agent and insurer, Atlantic Mutual, was deceptive. Lola Marine was fully aware of the existence of the charter since at least July 19, 2001, when Halstead executed the charter on behalf of Lola Marine. See Halstead Decl., Ex. A (Yacht Charter Agreement). Thus, Lola Marine was fully aware of the entire panoply of relevant facts surrounding the charter during the entire time the statute of limitations was running.

n14 Rule 32.3 of the Local Rules of the United States Court of Appeals for the First Circuit provides in part:

Rule 32.3. Citation of Unpublished Opinions

> (a) An unpublished opinion of this court may be cited in this court only in the following circumstances:
>
> (1) When the earlier opinion is relevant to establish a fact about the case before the court . . . .
>
> (2) Other circumstances. Citation of an unpublished opinion of this court is disfavored. Such an opinion may be cited only if (1) the party believes that the opinion persuasively addresses a material issue in the appeal; and (2) there is no published opinion from this court that adequately addresses the issue. **The court will consider such opinions for their persuasive value but not as binding precedent.**
>
> . . . .

1st Cir. R. 32.3 (bold added).

[*41]

Moreover, even if the court were to focus only on the knowledge of Atlantic Mutual, Atlantic Mutual learned of the charter at least two days prior to the expiration of the statute of limitations, but took no action to

notify either Plaintiff or her attorneys of this critical information. "Silence ... can be the basis for estoppel where there exists a duty not to remain silent as where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his detriment." Southex Exhibitions, Inc. V. Rhode Island Builders Assoc., 279 F.3d 94, 104 (1st Cir. 2002) (quoting Schiavulli v. Sch. Comm. Of Town of N. Providence, 114 R.I. 443, 334 A.2d 416, 419 (R.I. 1975)).

Lola Marine's second argument is that equitable estoppel does not apply to statements or admissions of legal conclusions. See Lola Marine's Reply at 3. Lola Marine asserts that "the gravamen of plaintiff's estoppel claim is that her attorneys were told she was a Jones Act employee of Lola Marine," Lola Marine's Reply at 3, and that "this ... is merely a conclusion of law," id., and as such cannot be the basis for an estoppel, see id. (citing, [*42] inter alia, Mississippi Power & Light Co. v. Pitts, 181 Miss. 344, 358-59, 179 So. 363 (Miss. 1938), 28 Am.Jur.2d, Estoppel and Waiver, §52 at 663-64, and Chicago, R.I. & P. Ry. Co. v. Sawyer, 1936 OK 299, 176 Okl. 446, 56 P.2d 418 (Okl. 1936)). The short answer to this argument is that Plaintiff seeks to have Lola Marine estopped from denying that it was Plaintiff's employer on August 18, 2005. Whether Lola Marine employed Plaintiff is a question of fact.

Lola Marine asserts in a footnote that "at no time did the underwriter [Atlantic Mutual], either in writing or verbally, ever tell plaintiff Jacqueline Bottega or her attorneys that defendant Lola Marine, Ltd. was Jacqueline Bottega's employer." See Lola Marine's Reply at 3 n.1 (citing Smieya 3/30/05 Decl.). However, this contention is directly disputed by Attorney Edelman, see Edelman Decl. P 2, and at least implicitly disputed by Plaintiff, see Bottega 3/9/05 Decl. PP 4, 6. Additionally, Mr. Smieya stated in his July 1, 2001, fax to Attorney Krasin that "Ms. Bottega was a Jones Act Seaman at the time of her employment with our insured." Plaintiff's Second Mem., Att. 3. It has been [*43] stipulated that Lola Marine was the named insured on this insurance policy. See Defendants' Reply, Ex. B ("Lovejoy 1/21/05 Statement") P 4 ("I agreed to stipulate ... that Lola Marine, Ltd. was the named insured on a marine insurance policy issued by Atlantic Mutual Insurance Company ...."). Given this stipulation and the statement in Mr. Smieya's July 1, 2001, fax, Lola Marine puts too fine a point on it in claiming that Atlantic Mutual did not tell Plaintiff that Lola Marine was her employer.

The third argument advanced by Lola Marine is that Plaintiff had knowledge or the means of knowledge concerning her employment and cannot be heard to claim estoppel due to her lack of proper diligence. See Lola Marine's Reply at 4 (citing Falcone v. Pierce, 864 F.2d 226, 231 (1st Cir. 1988) ("If, at the time when he acted,,) [the party claiming the benefit of the estoppel] had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment.") (quoting [*44] 3 J. Pomeroy, Equity Jurisprudence § 810, at 219) ) (alteration in original). Lola Marine asserts that:

> plaintiff had the same means of knowledge as did defendants as to the status of her employment. Indeed, she acted as witness to the bareboat charter and one page Yacht employment agreement. Simply put, she should not now be heard, at the "eleventh hour," to claim lack of knowledge of a one-page document, which was clearly labeled, placed under her very nose.

Lola Marine's Reply at 5.

The court disagrees with the assertion that Plaintiff had the same knowledge as Lola Marine. Plaintiff was not given copies of the charter and employment agreements, whereas Lola Marine, as a party executing these documents, presumably received copies or originals. Moreover, the basis for Lola Marine's contention that Plaintiff "acted as witness to the bareboat charter," Lola Marine's Reply at 5, is not clear to the court. The Yacht Charter Agreement does not reflect that Plaintiff witnessed it. See Yacht Charter Agreement. To the contrary, it reflects that it was witnessed by Captain Edgar and a person other than Plaintiff. See id. at 5; see also Yacht Employment Agreement. [*45] Even if Plaintiff had witnessed it, the Yacht Charter Agreement is a five page document, containing single spaced paragraphs of rather small print. See Yacht Charter Agreement. It is not reasonable to believe that a person acting as a mere witness to the execution of such a multipage document would have any significant knowledge of its contents.

While the Yacht Employment Agreement consists of one page, it also has multiple paragraphs, and the print, although larger than that on the Yacht Charter Agreement, is still relatively small. See Yacht Employment Agreement. It is similarly unreasonable to believe that a person being asked to witness the execution of this document would read its contents. Also, as previously noted, although the name of Captain Edgar was entered on the Yacht Employment Agreement, Plaintiff's name was not. n15 Thus, even if Plaintiff read the form, it would not have necessarily informed her that she was

part of the crew being employed pursuant to it. Indeed, the opposite conclusion seems more reasonable.

n15 See n.11.

[*46]

The court also has already determined, see discussion supra at 21-23, that a reasonable finder of fact could conclude that Plaintiff should not have known that Atlantic Mutual's statement that she was employed by its insured was misleading. Thus, the court rejects Lola Marine's third argument that Plaintiff cannot be heard to claim estoppel because of her alleged lack of proper diligence.

Lola Marine's fourth argument is that "no issue of fact prevents this court from granting Defendants' Motion to Dismiss." Lola Marine's Reply at 6. The court disagrees. The following facts, which are relevant to determining whether Lola Marine should be estopped from denying that it was Plaintiff's employer on August 18, 2001, are in dispute. Plaintiff claims that Mr. Smieya advised her that she "was a Jones Act seaman employed by their insured," n16 Bottega 3/9/05 Decl., but Mr. Smieya denies that he told Plaintiff that she was employed by Lola Marine, see Smieya 3/30/05 Statement P 10. Attorney Edelman claims that he had numerous conversations with Mr. Smieya and Ms. Nixon and that he was told by the insurance carrier's representatives (presumably referring to Mr. Smieya and Ms. Nixon) [*47] that "defendant, Lola Marine Ltd., was Ms. Bottega's Jones Act employer with regard to the injuries she sustained on August 18, 2001 ....'" Edelman Decl. P 2. Mr. Smieya denies making such a statement. See Smieya 3/30/05 Statement P 10.

n16 It has been stipulated that Lola Marine was the named insured on the policy of insurance issued by Atlantic Mutual. See Lovejoy 1/21/05 Statement P 4.

In addition, the following matters, while not in dispute, call out for further clarification. In response to a question posed by the court, see Scheduling and Briefing Order (Doc. #46) at 2-3, Lola Marine has stated that "Atlantic Mutual mistakenly made payments to [Plaintiff] because it believed, up until the time it actually was provided with a photocopy of the bareboat charter policy, that she was employed by William B. Halstead," Lola Marine's Response Brief at 2. Lola Marine does not explain what caused Atlantic Mutual to harbor the mistaken belief that Plaintiff was employed by Halstead. Did Halstead notify [*48] Atlantic Mutual of Plaintiff's claim? If so, what did he say about it and about Plaintiff's employment status? Did Halstead notify Atlantic Mutual of the bareboat charter? If yes, when? If it was not until August of 2004, what accounts for the delay? Lastly, Edgar Yacht Management, which Lola Marine contends was Plaintiff's employer when the vessel was not under bareboat charter, has alleged that Plaintiff was in the employ of Lola Marine. See Answer and Cross-Claim of Edgar Yacht Management, Inc. (Doc. #17) at 7. This directly contradicts Lola Marine's contention.

Given the factual disputes and other matters warranting clarification, the court cannot find as a matter of law that no estoppel could exist here. While "'estoppel becomes a question of law appropriate for summary judgment when facts are not in dispute,'" Lola Marine's Reply at 7 (quoting Osborn v. Princess Tours, Inc., 1996 U.S. Dist. LEXIS 22436, at *11 (C.D. Cal. Feb. 5, 1996), here sufficient facts are in dispute that the issue of estoppel is not susceptible to resolution as a matter of law.

**Conclusion**

For the reasons stated above, I recommend that the Motion to Dismiss be granted as to [*49] Defendant Halstead and denied as to Lola Marine. Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. See Fed. R. Civ. P. 72(b); D.R.I. Local R. 32. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

DAVID L. MARTIN
United States Magistrate Judge
July 21, 2005

# UNITED STATES DISTRICT COURT

FOR THE District of RHODE ISLAND

Jaqueline Bottega

V.

William B. Halstead, Edgar Yacht Management Inc. and Lola Marine Ltd.

## SUMMONS IN A CIVIL CASE

CASE NUMBER: CA 04 323ML

TO: (Name and address of Defendant)

Edgar Yacht Management Inc.
102 Inlet Drive
Wilmington, NC 28405

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Charles S. Beal (#5559)
Justin T. Shay (#2781)
Cameron & Mittleman LLP
56 Exchange Terrace
Providence, RI 02903
(401) 331-5700

an answer to the complaint which is served on you with this summons, within twenty (20) days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

CLERK

DATE 7/28/04

(By) DEPUTY CLERK

RECEIVED TIME FEB. 20. 4:54PM

COPY

**EDELMAN, KRASIN & JAYE, PLLC**
One Old Country Road – Suite 210
Carle Place, New York 11514
(516) 742-9200
PBE 8261

**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

---------------------------------------------------------------X

**JAQUELINE BOTTEGA,**

**Plaintiff,**

**-against-**

**WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT INC and LOLA MARINE LTD.,**

**Defendants.**

---------------------------------------------------------------X

**PLAINTIFF DEMANDS A TRIAL BY JURY**

**COMPLAINT**

**SEAMAN'S CASE UNDER THE JONES ACT FOR PERSONAL INJURIES**

**SUITS UNDER SPECIAL RULE FOR SEAMEN TO SUE WITHOUT SECURITY OR PREPAYMENT OF FEES FOR THE ENFORCEMENT OF THE LAWS OF THE UNITED STATES, COMMON AND STATUTORY, FOR THE PROTECTION AND HEALTH AND SAFETY OF SEAMEN AT SEA PURSUANT TO 28 USC 1916**

Plaintiff, **JAQUELINE BOTTEGA,** by her attorneys **EDELMAN, KRASIN & JAYE, PLLC**, complaining of the defendants, **WILLIAM B. HALSTEAD and EDGAR YACHT MANAGEMENT INC**, respectfully state and allege upon information and belief as follows:

**AS FOR THE FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF; JAQUELINE BOTTEGA**

**FIRST:** Plaintiff, **JAQUELINE BOTTEGA,** is a resident and citizen of the State of New York.

**SECOND**: Defendant, **EDGAR YACHT MANAGEMENT INC**, is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

**THIRD**: Defendant, **WILLIAM B. HALSTEAD**, is a resident and citizen of the State of Rhode Island.

**FOURTH**: Defendant, **LOLA MARINE LTD**., is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

**FIFTH**: This action is brought under the Admiralty Law as modified by the Jones Act, 46 U.S.C. § 688, and the Court's Admiralty and Maritime Jurisdiction pursuant to 28 U.S.C. § 1333. Nothing in these jurisdictional allegations is to be construed as a waiver of the plaintiff's right to a jury trial in plaintiff's action at law under the Jones Act, nor of the right to have all of the claims asserted herein tried to a jury, at plaintiff's option

**SIXTH**: At all times material hereto defendant, **WILLIAM B.HALSTEAD** was the captain of the vessel known as **LOLA**.

**SEVENTH**: At all times material hereto defendant, **WILLIAM B. HALSTEAD**, managed and maintained the vessel **LOLA**.

**EIGHTH**: At all times material hereto defendant, **WILLIAM B. HALSTEAD**, operated and controlled the vessel **LOLA**.

**NINTH**: At all times material hereto defendant, **WILLIAM B. HALSTEAD**, owned the vessel **LOLA**.

**TENTH**: At all times material hereto defendant, **WILLIAM B. HALSTEAD**, hired the crew of the vessel **LOLA**.

**ELEVENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, managed and maintained the vessel **LOLA.**

**TWELFTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, operated and controlled the vessel **LOLA.**

**THIRTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, owned the vessel **LOLA.**

**FOURTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, hired the crew of vessel **LOLA.**

**FIFTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, managed and maintained the vessel **LOLA.**

**SIXTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, operated and controlled the vessel **LOLA.**

**SEVENTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, owned the vessel **LOLA.**

**EIGHTEENTH:** At all times material hereto defendant, **EDGAR YACHT MANAGEMENT INC**, hired the crew of vessel **LOLA.**

**NINETEENTH:** On August 18, 2001, and at all times mentioned herein, Plaintiff was employed as a member of the crew of vessel **LOLA.**

**TWENTIETH:** On August 18, 2001, and at all times mentioned herein, Plaintiff was an employee of **WILLIAM HALSTEAD.**

**TWENTY-FIRST:** On August 18, 2001, Plaintiff was an employee of **EDGAR YACHT MANAGEMENT INC.**

**TWENTY-SECOND:** On August 18, 2001, while vessel **LOLA**, was operating in United States territorial waters, Plaintiff, **JAQUELINE BOTTEGA**, in the course of her employment, pursuant to orders, and while in the performance of his duties, because of the unsafe and unseaworthy condition of the vessel and the negligence of the defendants, was caused to sustain serious and permanent injuries.

**TWENTY-THIRD:** Plaintiff's, **JAQUELINE BOTTEGA**, injuries were caused by the negligence of the defendants, by their agents, servants, workmen, and employees, by the unseaworthiness of the vessel, and by the defendants' breach of its obligation under the circumstances including its obligation to provide a safe and seaworthy vessel.

**TWENTY-FOURTH:** Plaintiff's injuries were sustained solely by reason of the negligence of the defendants and the defendant's agents, servants and employees and the actions of plaintiff did not contribute in any way to the injuries sustained.

**TWENTY-FIFTH:** At the time Plaintiff, **JAQUELINE BOTTEGA**, entered defendant's **WILLIAM B. HALSTEAD**, employ, she was a strong, robust and able-bodied person with a substantial earning capacity and prospects of advancement in earning capacity.

**TWENTY-SIXTH:** ¡As a consequence of the negligence of the defendants as aforesaid, the plaintiff suffered unnecessary, severe and permanent injuries as well as severe mental anguish, shock, pain and disability.

**TWENTY-SEVENTH:** Plaintiff makes a claim for the economic value of her normal life expectancy all to his damage in the sum of **FIVE MILLION ($5,000,000.00) DOLLARS.**

**AS FOR THE SECOND CAUSE OF ACTION ON BEHALF OF PLAINTIFF; JAQUELINE BOTTEGA**

**<u>TWENTY-EIGHTH:</u>** The plaintiff repeats and re-alleges each every allegation of the First Cause of Action of the complaint as if fully set forth herein.

**<u>TWENTY-NINTH</u>**: That on August 18, 2001, without any fault on the part of the plaintiff, plaintiff was injured while employed as a crew member of the vessel **LOLA** by reason of the unseaworthiness of said vessel.

**<u>THIRTIETH</u>**: That as a result of the foregoing, the plaintiff was rendered sick, sore, lame and disabled, and sustained severe permanent personal injuries and was prevented from attending her daily labors, thereby losing sums of money which she otherwise would have earned as wages, and has endeavored to be cured of her injuries, and has expended sums of money to maintain herself, and will continue to endure pain and suffering to all her damage.

**<u>THIRTY-FIRST</u>**: That by reason of the foregoing, the plaintiff has been damaged in the sum of **ONE MILLION ($1,000,000) DOLLARS**.

**<u>AS FOR THE THIRD CAUSE OF ACTION ON BEHALF OF PLAINTIFF; JAQUELINE BOTTEGA:</u>**

**<u>THIRTY-SECOND:</u>** That the Plaintiff repeats and realleges all of the foregoing paragraphs of the complaint with the same force and effect as if herein set forth at length.

**<u>THIRTY-THIRD</u>**: That it was the duty of the defendant to provide the plaintiff with the expenses of his maintenance and cure.

**<u>THIRTY-FOURTH</u>:** That the plaintiff became disabled as heretofore described, but the defendant failed, neglected and refused to furnish the plaintiff with the expenses of his maintenance and cure, all to her damage in a sum, which exceeds **ONE HUNDRED FIFTY THOUSAND ($150,000.00) DOLLARS**, in an amount to be determined at a trial of this matter.

**W H E R E F O R E:** Plaintiff prays that judgment be entered against the defendants in the amount of **FIVE MILLION ($5,000,000.00) DOLLARS** for the First Cause of Action, **ONE MILLION ($1,000,000.00) DOLLARS** for the Second Cause of Action, and **ONE HUNDRED AND FIFTY THOUSAND ($150,000.00) DOLLARS** for the Third Cause of Action and.

Dated: Carle Place, New York
July 16, 2004

Yours, etc.,

**EDELMAN, KRASIN & JAYE, PLLC**
Attorneys for Plaintiffs
BY: ______________________
**GREGORY D. BELLANTONE**
One Old Country Road – Suite 210
Carle Place, New York 11514
(516) 742-9200
Of Counsel

Jaqueline Bottega,

By Her Attorneys,

______________________
Justin T. Shay (#2781)
Charles S. Beal (#5559)
Cameron & Mittleman LLP
56 Exchange Terrace
Providence, Rhode Island 02903
(401) 331-5700
FAX (401) 331-5787

Dated: July 28, 2004

JURY DEMAND

Plaintiff demands a trial by jury.

______________________
Charles S. Beal (#5559)

Justin T. Shay (#2781)
Charles S. Beal (#5559)
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(401) 331-5700

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

C.A. No.:04-323ML

JAQUELINE BOTTEGA,

Plaintiff,

PLAINTIFF DEMANDS A TRIAL BY JURY

-against-

AMENDED COMPLAINT

SEAMAN'S CASE UNDER THE JONES ACT FOR PERSONAL INJURIES

WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT INC and LOLA MARINE LTD.,

Defendants.

SUITS UNDER SPECIAL RULE FOR SEAMEN TO SUE WITHOUT SECURITY OR PREPAYMENT OF FEES FOR THE ENFORCEMENT OF THE LAWS OF THE UNITED STATES, COMMON AND STATUTORY, FOR THE PROTECTION AND HEALTH AND SAFETY OF SEAMEN AT SEA PURSUANT TO 28 USC 1916

Plaintiff, JAQUELINE BOTTEGA, by her attorneys CAMERON & MITTLEMAN, LLP, complaining of the defendants, WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT INC and LOLA MARINE LTD., respectfully state and allege upon information and belief as follows:

12|26

**<u>AS FOR THE FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF: JAQUELINE BOTTEGA</u>**

**<u>FIRST</u>:** Plaintiff, **JAQUELINE BOTTEGA**, is a resident and citizen of the State of New York.

**<u>SECOND</u>:** Defendant, **EDGAR YACHT MANAGEMENT INC**, is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

**<u>THIRD</u>:** Upon information and belief, Defendant, **WILLIAM B. HALSTEAD**, is a resident and citizen of the State of Rhode Island.

**<u>FOURTH</u>:** Defendant, **LOLA MARINE LTD.**, is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

**<u>FIFTH</u>:** This action is brought under the Admiralty Law as modified by the Jones Act, 46 U.S.C. § 688, and the Court's Admiralty and Maritime Jurisdiction pursuant to 28 U.S.C. § 1333. Nothing in these jurisdictional allegations is to be construed as a waiver of the plaintiff's right to a jury trial in plaintiff's action at law under the Jones Act, nor of the right to have all of the claims asserted herein tried to a jury, at plaintiff's option.

**<u>SIXTH</u>:** At all times material hereto defendant, **WILLIAM B. HALSTEAD** was the captain of the vessel known as **LOLA**.

**<u>SEVENTH</u>:** At all times material hereto defendant, **WILLIAM B. HALSTEAD**, managed and maintained the vessel **LOLA**.

**<u>EIGHTH</u>:** At all times material hereto defendant, **WILLIAM B. HALSTEAD**, operated and controlled the vessel **LOLA**.

13|26

**NINTH:** At all times material hereto defendant, WILLIAM B. HALSTEAD, owned the vessel LOLA.

**TENTH:** At all times material hereto defendant, WILLIAM B. HALSTEAD, hired the crew of the vessel LOLA.

**ELEVENTH:** At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, managed and maintained the vessel LOLA.

**TWELFTH:** At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, operated and controlled the vessel LOLA.

**THIRTEENTH:** At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, owned the vessel LOLA.

**FOURTEENTH:** At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC., hired the crew of vessel LOLA.

**FIFTEENTH:** At all times material hereto defendant, LOLA MARINE LTD., managed and maintained the vessel LOLA.

**SIXTEENTH:** At all times material hereto defendant, LOLA MARINE, LTD, operated and controlled the vessel LOLA.

**SEVENTEENTH:** At all times material hereto defendant, LOLA MARINE LTD, owned the vessel LOLA.

**EIGHTEENTH:** At all times material hereto defendant, LOLA MARINE LTD, hired the crew of vessel LOLA.

**NINETEENTH:** On August 18, 2001, and at all times mentioned herein, Plaintiff was employed as a member of the crew of vessel LOLA.

14/26

**TWENTIETH:** On August 18, 2001, and at all times mentioned herein, Plaintiff was an employee of **WILLIAM HALSTEAD.**

**TWENTY-FIRST:** On August 18, 2001, and at all times hereinafter mentioned, Plaintiff was an employee of **LOLA MARINE LTD.**

**TWENTY-SECOND:** On August 18, 2001, Plaintiff was an employee of **EDGAR YACHT MANAGEMENT INC.**

**TWENTY-THIRD:** On August 18, 2001, while vessel **LOLA**, was operating in United States territorial waters, Plaintiff, **JAQUELINE BOTTEGA**, in the course of her employment, pursuant to orders, and while in the performance of her duties, because of the unsafe and unseaworthy condition of the vessel and the negligence of the defendants, was caused to sustain serious and permanent injuries.

**TWENTY-FOURTH:** Plaintiff's, **JAQUELINE BOTTEGA**, injuries were caused by the negligence of the defendants, by their agents, servants, workmen, and employees, by the unseaworthiness of the vessel, and by the defendants' breach of its obligation under the circumstances including its obligation to provide a safe and seaworthy vessel.

**TWENTY-FIFTH:** Plaintiff's injuries were sustained solely by reason of the negligence of the defendants and the defendant's agents, servants and employees and the actions of plaintiff did not contribute in any way to the injuries sustained.

**TWENTY-SIXTH:** At the time Plaintiff, **JAQUELINE BOTTEGA**, entered defendant's employ, she was a strong, robust and able-bodied person with a substantial earning capacity and prospects of advancement in earning capacity.

15/26

**TWENTY-SEVENTH:** As a consequence of the negligence of the defendants as aforesaid, the plaintiff suffered unnecessary, severe and permanent injuries as well as severe mental anguish, shock, pain, disability and reduced earning capacity.

**TWENTY-EIGHTH:** Plaintiff makes a claim for the economic value of her normal life expectancy all to her damage in the sum of **FIVE MILLION ($5,000,000.00) DOLLARS.**

**AS FOR THE SECOND CAUSE OF ACTION ON BEHALF OF PLAINTIFF: JAQUELINE BOTTEGA**

**TWENTY-NINTH:** The plaintiff repeats and re-alleges each every allegation of the First Cause of Action of the complaint as if fully set forth herein.

**THIRTIETH:** That on August 18, 2001, plaintiff was injured while employed as a crew member of the vessel LOLA by reason of the unseaworthiness of said vessel, without any negligence on part of the plaintiff contributing thereto.

**THIRY-FIRST:** That as a result of the foregoing, the plaintiff was rendered sick, sore, lame and disabled, and sustained severe permanent personal injuries and was prevented from attending her daily labors, thereby losing sums of money which she otherwise would have earned as wages, and has endeavored to be cured of her injuries, and has expended sums of money to maintain herself, and will continue to endure pain and suffering to all her damage.

**THIRTY-SECOND:** That by reason of the foregoing, the plaintiff has been damaged in the sum of **FIVE MILLION ($5,000,000) DOLLARS.**

**AS FOR THE THIRD CAUSE OF ACTION ON BEHALF OF PLAINTIFF: JAQUELINE BOTTEGA:**

**THIRTY-THIRD:** That the Plaintiff repeats and realleges all of the foregoing paragraphs of the complaint with the same force and effect as if herein set forth at length.

16/26

**THIRTY-FOURTH:** That it was the duty of the defendant to provide the plaintiff with the expenses of her maintenance and cure.

**THIRTY-FIFTH:** That the plaintiff became disabled as heretofore described, but the defendant failed, neglected and refused to furnish the plaintiff with the expenses of his maintenance and cure, all to her damage in a sum, which exceeds ONE HUNDRED FIFTY THOUSAND ($150,000.00) DOLLARS, or in an amount to be determined at a trial of this matter.

WHEREFORE: Plaintiff prays that judgment be entered against the defendants in the amount of FIVE MILLION ($5,000,000.00) DOLLARS for the First Cause of Action, FIVE MILLION ($5,000,000.00) DOLLARS for the Second Cause of Action, and ONE HUNDRED AND FIFTY THOUSAND ($150,000.00) DOLLARS for the Third Cause of Action and.

Dated: August 13, 2004

Yours, etc.,

Justin T. Shay (#2781)
Charles S. Beal(#5559)
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(401) 331-5700

Gregory D. Bellantone- Of Counsel
Edelman, Krasin & Jaye, PLLC
One Old Country Road – Suite 210
Carle Place, New York 11514
(516) 742-9200
(516) 742-7637 fax

**JURY DEMAND**
Plaintiff demands a trial by jury.

17/26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JACQUELINE BOTTEGA,
Plaintiff,

v. C.A. NO. 04-323ML

EDGAR YACHT MANAGEMENT,
INC., and LOLA MARINE, LTD.,
Defendants.

COPY

LOLA MARINE, LTD.,
Third-Party Plaintiff,

v.

J.W. KAEMPFER,
Third-Party Defendant.

The deposition of **ROBERT EDGAR**, taken pursuant to the Federal Rules of Civil Procedure on October 20, 2006, by the Defendant, Lola Marine, Ltd., at the offices of Cameron & Mittleman, 56 Exchange Terrace, Providence, Rhode Island, commencing at 11:08 a.m., before Theresa A. Mullaugh, RMR, Notary Public.

REPORTING ASSOCIATES
10 Dorrance Street, Suite 617
Providence, RI 02903
(401) 351-1660

A. No.
Q. Do you know who furnished the two crew members?
A. Bill Halstead is who it would be, who myself and the crew members worked for.
Q. Well, you said during the charter agreement you worked for Mr. Kaempfer, correct?
A. Well, during the charter that we would all work for Mr. Kaempfer. But before and after we worked for Mr. Halstead.
Q. Okay. Fair enough.
And just so I'm clear, if you look at Exhibit 13, can you tell us the term of the charter? Is that on the first page, which is Bates Number 17?
A. The dates, is that what you --
Q. Yes, sir.
A. Friday, the 10th, August 2001, 1200 hours, till Monday, the 20th of August, 2001.
Q. And what date was Ms. Bottega injured on, sir?
A. The -- was it the 18th?
MR. PELOQUIN: I believe you made that representation on the record.
Q. I made the representation. Was it a date between August 10th and August 20th, 2001?
A. Yes, sir.

MR. LOVEJOY: I'm going to pass the witness.

I don't know where you're going next, but you're going to get another lawyer.

THE WITNESS: Okay.

(Whereupon, a brief discussion was had off the record, and the following proceedings continued.)

**EXAMINATION BY MR. BELLANTONE**

Q. Good afternoon. My name is Gregory Bellantone, and I represent Jacqueline Bottega, with regard to this case.

I'm going to have some questions for you this afternoon. I'm going to try not to repeat any questions that were already asked. If you don't understand my question, please let me know and I'll rephrase the question for you. Okay?

A. Yes, sir.

Q. I just want to go back to when you met Ms. Bottega sometime in March or April of 2001 in St. Maarten.

A. Yes.

Q. Is that correct?

A. Yes.

Q. During the time that you were interviewing her did you discuss the terms of her employment?

A. Yes.
Q. And do you recall what the terms of the employment you discussed at that time?
A. That we would work together aboard LOLA until the end of the season. And then when -- we would renegotiate any pay term, that sort of thing at the end of the season, means -- the end of -- usually -- like she started in the middle of the season, so the end of the summer.
Q. And when she was hired, she was hired as a stewardess/deckhand?
A. Yes.
Q. And at the time you interviewed her did you discuss her compensation?
A. That's correct.
Q. What was her compensation?
A. I believe it was -- I'm not sure of the first month, but I know that she was $3,000
Q. $3,000 a month?
A. Yes, sir.
Q. And do you know, was that paid monthly, bi-weekly, weekly?
A. Monthly.
Q. And do you know how those payments were made to her?

A. Via Edgar Yacht Management from Bill Halstead.
Q. And explain how that process went, the payment of Jacqueline Bottega during her employment with the LOLA.
A. I disbursed monies as needed for the boat in behalf of Bill Halstead. The reason why it's called Edgar Yacht Management is that was an old company name from when before I worked for Mr. Halstead full time.
And he would -- well, in terms of the charter, any money was always paid to Bill Halstead. And then any expenses, payroll, that sort of thing that needed to be paid out or disbursed, I did that for him.
Q. So in other words, Mr. Halstead would put money into your account and then you would disburse money on his behalf?
A. That's right, yes.
Q. And with Ms. Bottega would you make direct deposits into an account that she gave you?
A. I don't remember. Sometimes I believe a check to her, that sort of thing.
Q. Do you know who was responsible for any kind of tax withholding during Ms. Bottega's employment with the LOLA?

A. Jackie would be responsible for that.
Q. For her own tax withholding?
A. Yes, as I am for my own.
Q. And who would be responsible for issuing either a W-2 or a 1099 for the wages that were paid?
A. Bill Halstead.
Q. And with regard to Ms. Bottega's employment in 2001 and while she worked for the LOLA, do you know if she was a W-2 employee or a 1099 employee or something else?
A. I don't know.
Q. When you were paid by Mr. Halstead, did he ever give you a 1099 or a W-2?
A. I was -- I'm not sure what the -- what it's called, but it was basically what monies had been spent. I'm not sure if it's a W-2 or a 1099, but it's basically what money was spent to -- paid to me.
Q. And do you know if he ever issued a W-2 or 1099 to Ms. Bottega?
A. I don't know
Q. Do you know who is responsible for any kind of Social Security withholdings?
A. Jackie.
Q. Do you know if Ms. Bottega was - ever filled out a

W-4 income tax form which would show the number of deductions she was claiming on any kind of income?

A. I don't know. I'm not sure. I don't know anything about that.

Q. Did you speak to Mr. Halstead before you hired Ms. Bottega?

A. Yes.

Q. And did you get Mr. Halstead's permission to hire Ms. Bottega to work on the vessel?

A. Yes.

Q. And did you also at the time you hired her ask for her Social Security number?

A. No.

Q. Do you know if anyone -- if Mr. Halstead was given her Social Security number at any time?

A. I don't know.

Q. At some point -- so you indicated earlier you formed this Edgar Yacht Management, Inc., sometime in the late '90s?

A. Early '90s.

Q. Early '90s. And at that time -- I think it was in 1996 you started working for Mr. Halstead; is that correct?

A. Yes. I had worked for him in the past, as I stated before. But that's when I started working

for your job and your being paid for captain on the vessel, LOLA, for that charter in 2001?
A. No, sir.
Q. Do you -- did you receive compensation for being captain on the Kaempfer charter?
A. I was paid by Bill Halstead for the --
Q. And how were you paid by Mr. Halstead?
A. The same as every other month.
Q. And with regard to that same charter, do you know how Jackie Bottega was paid for services during the work that she did on the Kaempfer charter?
A. She was paid the same as usual.
Q. Was that by Mr. Halstead?
A. By Mr. Halstead via Edgar Yacht Management.
Q. And at that time did Edgar Yacht Management have an account at the First Citizens Bank in North Carolina?
A. That's correct.

MR. BELLANTONE: Can you mark these as Plaintiff's 3, 4 and 5.

(Plaintiff's Exhibits 3, 4 and 5 for I.D.: Printouts for deposits made into Jacqueline Bottega's account)

Q. Captain, I'm going to show you what's been marked as Plaintiff's Exhibits 3, 4 and 5, which are printouts for deposits made into Jacqueline

Bottega's account. And I'm going to ask you to take a look at these and see if you recognize those documents.
A. Yes.
Q. And can you tell me what those documents represent?
A. I'm not a hundred percent sure, but I believe they're wire transfers.
Q. And are they wire transfers from your account to Jacqueline Bottega's account?
A. Yes.
Q. Is that the method that she was paid while she worked?
A. Sometimes. It's up to them how they want to get -- if they want to get paid, what account.
Q. But were those monies put into your account by Mr. Halstead and then you disbursed them to Jacqueline Bottega pursuant to her instructions?
A. That's correct.
Q. Do you know if Ms. Bottega signed a Yacht Employment Agreement with Mr. Kaempfer?
A. I don't.
Q. Did Mr. Kaempfer ever request any members of your crew to sign a Yacht Employment Agreement?
A. I don't believe so.

A. Maybe to the insurance company. I'm not sure if it was -- a couple of times we spoke about it to the insurance company for Lola Marine.

Q. Did you tell Mr. Halstead that you were reporting the accident to his insurance company or Lola Marine's insurance company?

A. Yes.

Q. In August of 2001 were you familiar with the term of "maintenance and cure"?

A. I guess not.

Q. In August of 2001 were you aware that when a seaman gets hurt in the course of their employment on a vessel, that the vessel owner would be responsible for making payments for their maintenance and cure?

MR. LOVEJOY: Objection.

A. Yes.

Q. Did you have a conversation with Mr. Halstead regarding that?

A. Yes.

Q. And do you recall the sum and substance of that conversation, what you said to him and what he said to you?

A. Yeah. We talked about making sure that, you know, that we claim - we claimed it on the insurance and

that - made sure that she was able to get treatment.

Q. And how did you report it to the insurance company?

A. They -- the brokers for the insurance company have an office at the marina at Goat Island.

Q. And did you report it to the broker at the marina?

A. Yeah. And then I guess we called after that too. You know, we called. We made a claim over the phone as well, yeah.

Q. Where did you receive the insurance information from?

A. The broker for the Hinckley insurance is -- the broker for the insurance is right at Goat Island Marina.

Q. That's the broker for Lola Marine?

A. They -- yeah, they're the broker for the insurance. They insure the boat, yeah.

Q. Did you tell them what happened?

A. Yes.

Q. After you advised the broker --

A. Well, we advised the insurance company.

Q. Did you speak to anyone at the insurance company?

A. Yes.

Q. Who did you speak to at the insurance company?

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JACQUELINE BOTTEGA,
Plaintiff,

VS. C.A. NO. 04-323ML

EDGAR YACHT MANAGEMENT, INC., and LOLA MARINE, LTD.,
Defendants.

---

LOLA MARINE, LTD.,
Third-Party Plaintiff,

VS.

J.W. KAEMPFER,
Third-Party Defendant.

DEPOSITION OF JACQUELINE BOTTEGA, the Plaintiff in the above-entitled cause, taken on behalf of the Defendant, Lola Marine, Ltd., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Cameron & Mittleman, 56 Exchange Terrace, Providence, Rhode Island, on January 17, 2007, at 11:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

about powerboats.
THE WITNESS: Sailing a powerboat is sailing, too.
MR. LOVEJOY: Off the record.
(OFF THE RECORD)
Q. Do you know what Mr. Volpi does for a living?
A. Yes.
Q. What does he do?
A. He owns his own company. It's a mooring company.
Q. And where is that company located?
A. In Northport, New York.
Q. Unfortunately, I didn't get the dates for 51 Everett Street. What dates did you live at 51 Everett Street?
A. I'm not sure.
Q. Approximately how long did you live there?
A. Approximately for a year. It was six or 12 months.
Q. Approximately January 2004 to January 2005; does that sound right?
A. No, no. Like I said, I'm not sure.
Q. Well, do you remember what year you lived at that address?
A. I believe it was -- I'm not sure.



Q. Let's go on to the next address. Prior to 51 Everett Street, where did you live or reside, Miss Bottega?
A. Connecticut.
Q. Where in Connecticut?
A. Norwalk, Connecticut.
Q. What address in Norwalk, Connecticut?
A. It was at the Clark Tower Apartments.
Q. Which is off of the Route 7 extension?
A. Yes.
Q. Clark Tower, are they condominiums?
A. Yes.
Q. And did you rent a condominium or own a condominium there?
A. Rented.
Q. Did you rent that by yourself, or did you rent it with some other person or persons?
A. I rented it with another person.
Q. Who is that person, please?
A. Arthur Allen.
Q. A-l-l-e-n or a-n?
A. A-l-l-e-n.
Q. And how long did you reside at the Clark Tower condominiums?
A. I'm not sure, for probably six months.



Q. And can you tell us who Arthur Allen is?
A. He was my boyfriend at the time.
Q. Does he still live at the Clark Tower condominiums?
A. No.
Q. Do you know where he lives?
A. I know he lives in Norwalk, but I don't know where.
Q. What does Mr. Allen do as a profession?
A. He's a merchant marine. He's in that business.
Q. Does he sail on commercial ships?
A. He used to. I'm not sure what he's doing now.
Q. Do you know, what was he doing when you shared an apartment with him for six months?
A. He actually just started a job working in an office for a shipping company.
Q. Do you know the name of that shipping company?
A. No, I don't remember.
Q. Do you know what town that shipping company is located in?
A. No.
Q. Where did you live prior to Clark Tower condominiums?
A. 18 Shorewood Lane.
Q. And what years or year did you live there?



A. It should have been in 2001.
Q. Prior to that address, where did you reside?
A. I was on Lola.
Q. And prior to being on Lola -- well, what dates, if you remember, were you on Lola?
A. Lola, I was on -- it was the beginning of February, end of January 2001.
Q. Until August 2001?
A. Correct.
Q. Where did you reside or live prior to being on Lola?
A. I was working and living on Knickerbocker, the sailing vessel Knickerbocker.
Q. How long were you on the Knickerbocker?
A. I believe from September 2000.
Q. September of 2000 to January, February 2001?
A. Yes, correct.
Q. Prior to the Knickerbocker, where did you live?
A. There was some gaps in there, and I worked on some other boats, and then I was on Knickerbocker before that as well.
Q. What other boats were you on?
A. I worked on Magic Time.
Q. What type of boat is the Magic Time?
A. She's a motor yacht.

A. No.
Q. And what time did she depart or heave anchor on the 18th of August 2001?
A. I don't remember.
Q. Do you remember whether it was the morning, midday, afternoon?
A. I don't remember.
Q. Do you remember how long she was underway before the incident happened?
A. A couple of hours.
Q. And do you remember whether she was under sail for the couple hours before the incident?
A. I believe she was under sail, yes.
Q. And do you know where she sailed during that couple of hours?
A. Off of which island?
Q. Off of what island?
A. I don't remember.
Q. Or what location?
A. I don't remember.
Q. During the couple hours, did she -- strike that. When she was in Maine, did she normally sail in an area where there were islands located, or out in open waters?
A. Where we were in Maine, there was a lot of



little islands.
Q. And on a normal day, where was she sailed? In those islands, or did she go outside of the islands?
MR. BELLANTONE: Note my objection to the form. You can answer the question.
A. I don't remember whether it was -- I don't remember.
Q. On the 18th of August, besides the time of when the incident occurred, did you ever steer the vessel earlier in that day?
A. No.
Q. And you came up on the topside about five or 10 minutes before the incident occurred?
A. Yes.
Q. How did you go up on the deck at that point in time?
A. The companionway through the cockpit.
Q. No, no, you said you were down below with the guests, correct?
A. Yes.
Q. How did it come that you went up on deck at that particular point in time?
A. To check on other guests.
Q. So did you decide to go topside at that time?



A. Yes.
Q. And how did it come that you steered the vessel at that point in time?
A. The captain asked me to.
Q. And what did the captain do after you took the wheel?
A. He went over to the mainsheet winch.
Q. And what was he doing at the mainsheet winch?
A. He was letting out the sail, letting out the sheet to go wing to wing.
Q. And were you watching him, or what were you doing at the time?
A. I was watching the direction I was heading.
Q. Did the captain eventually get the mainsheet slackened so the vessel went wing to wing, as you say?
A. I'm sorry, I don't understand. Did he eventually let -- can you repeat that.
Q. You said he was trying to get the vessel to sail wing to wing, correct?
A. Yes.
Q. Did he accomplish that mission, Miss Bottega?
A. It briefly, and it came -- it briefly went wing to wing, yes.
Q. And when you say briefly, what period of time are



we talking about?
A. A few seconds, seconds, under a minute.
Q. And when the captain, when he got the mainsheet, were you maintaining a set course?
A. Yes.
Q. Did you change the direction of the vessel at any time?
A. No.
Q. Didn't move the wheel at all? You had the wheel in the same position the entire time?
A. No. I adjusted the wheel just to keep us in the same direction, yes.
Q. And how many wheel adjustments did you make during the five or 10 minutes that you were at the helm?
A. I'm not sure. It depends on the direction of the wind we had. I was trying to keep the boat in the same direction and steady, so you move the wheel just fractions of amounts.
Q. How are you determining that you were keeping the vessel going in the same direction? Were you looking at an electronic navigation device? Were you looking at the sails? Were you looking at the water with respect to landmarks? Tell us how you were determining to do that?
A. A compass.

Page 126

Q. Where did you work?
A. Outdoor Sports Center.
Q. Where is that located, please?
A. In Connecticut. I don't remember.
Q. Do you know the town?
A. I don't remember.
Q. Were you being paid by the hour?
A. Yes.
Q. What was your hourly pay?
A. I don't remember at this time.
Q. Now, you worked for the vessel Lola, correct?
A. Yes.
Q. And were you paid by Captain Edgar or an entity called Edgar Yacht Management?
A. Edgar Yacht Management, yes.
Q. Paid you?
A. Put it in my account, yes.
Q. How much were you paid a month or a week or what have you?
A. There were different installments into my account, sometimes from $2,500 to $3,000.
Q. Why the difference?
A. I guess it wasn't consistent paying. It wasn't like he paid me every week or every month. It was whenever he could get a transfer to go through.

Page 127

Q. Did you have an agreement as to what you were to be paid a week or a month?
A. Yeah.
Q. What was that agreement?
A. I don't remember what we agreed on, no, I don't remember.
MR. LOVEJOY: Mark that as Bottega 2.
(DEFENDANT'S EXHIBIT 2 MARKED FOR IDENTIFICATION)
Q. I'm going to hand that to your counsel first. Miss Bottega, have you ever seen that document before?
A. I don't remember if I saw this, no.
Q. Well, down on the bottom there's some signatures, do you recognize any of those signatures at the bottom?
A. I recognize my signature.
Q. Would you be kind enough to use Mr. Peloquin's pink or fuchsia Magic Marker and highlight your name where it appears on Bottega 2, please.
(WITNESS COMPLIED)
Q. Thank you. It's on the lower right-hand corner?
A. Yes.
Q. Do you remember signing that document?
A. Vaguely.
Q. Tell us vaguely what you remember?

Page 128

A. I remember having to sign a document as a witness that they were signing their signatures.
Q. Where did you sign it?
A. I believe it was in Lola.
Q. On the vessel itself?
A. On the vessel.
Q. Is there a date next to your signature?
A. Yes.
Q. Can you make out what the date is?
A. No.
Q. Do you remember the circumstances under which you were asked to sign that document?
MR. BELLANTONE: Other than what she already testified to?
MR. LOVEJOY: I think she testified she signed as a witness.
MR. BELLANTONE: Right.
Q. Is that correct?
A. Yes.
Q. Did somebody come to you and say, can you sign as a witness? Or what did they say to you exactly with respect to you signing as a witness?
A. I don't remember what was said to me other than, could you sign this as a witness to these signatures.

Page 129

Q. Who asked you to sign as a witness?
A. Robert Edgar.
Q. And did you ask him what you were signing before you signed it?
A. No. I was only signing as a witness. I didn't ask, no.
Q. Did you look at the document before you signed it?
A. I don't remember if I did or not.
Q. I can't hear you.
A. I don't remember.
Q. You don't remember whether you looked at it?
A. I looked at it, but I don't remember if I read it.
Q. Well, do you remember if you looked at the heading on the document?
A. No, I don't remember that.
Q. At the top it says, Yacht Employment Agreement, correct, in larger print than the body of the document?
A. Yes.
Q. Do you remember seeing those words at the top of the document?
A. No, I don't remember.
MR. BELLANTONE: Note my objection. Asked and answered three times.

Q. So what you're telling us is you signed this document without looking at the heading or reading any portion of that document?
A. No, I don't remember, no.
Q. You do not remember whether you looked at the heading or read any portion of that document?
A. Yes.
Q. And just so I'm clear, you didn't ask Captain Edgar what the document meant or referred to?
A. No.
Q. Now, with respect to your injury, do you blame Captain Edgar for your injury, or do you blame yourself in part for it, or both of you, or nobody?
A. I believe it was definitely an accident.
Q. And when you say you believe it was definitely an accident, can you tell us what your understanding of an accident is?
A. I don't think it was planned that I was going to get hurt, that's what I mean.
Q. Is there something that Captain Edgar did that resulted in the accident?
A. He had decided that he wanted to go wing to wing without a preventer on the main boom, which caused the whole boom to come flying back, which



wouldn't have happened with a preventer.
Q. And did the accident result because of the fact that there was no preventer on it or because of the way the vessel was being maneuvered?
A. No, because there was no preventer on it.
Q. Well, I mean, if the course changed on the vessel, was that what caused the vessel to jibe?
MR. BELLANTONE: Objection, speculation. Ask her what happened. You're saying if.
MR. LOVEJOY: Well, she testified earlier that she moved the wheel back and forth.
MR. BELLANTONE: So ask her if she caused the thing to jibe.
MR. LOVEJOY: Mr. Bellantone, you seem to testify when you want to.
MR. BELLANTONE: I'm not testifying. Ask the proper question.
MR. LOVEJOY: Make your objection, and please don't testify.
MR. BELLANTONE: Objection to the form of the question.
Q. What caused the vessel to jibe?
A. The change in the wind direction.
Q. So your steering the vessel had nothing to do with



it jibing whatsoever?
A. I stayed to course, so no.
Q. Now, you mentioned a preventer, what experience do you have with preventers, Miss Bottega?
A. On the sailing vessel Lola, before when Robert had wanted the sails to be wing to wing, the preventer was put on the main boom to keep it from jibing.
Q. And do you know what speed the vessel was going at when the preventer was used?
A. I don't remember.
Q. And how many times did the vessel use a preventer during the period you were on it from February to August 2001?
A. More than two times.
Q. And where did it use a preventer?
A. I don't remember.
Q. You don't remember where the preventer was used?
A. Are you asking me where the sailing vessel was located?
Q. Yes, where was the vessel when the preventer was used?
A. I don't remember.
Q. You don't remember whether it was used in St. Maarten, North Carolina, Newport, Maine?



A. I know that there were other crew members on board, so it was prior to Newport.
Q. Do you know whether it was used on the delivery leg from North Carolina to Newport?
A. I don't remember.
Q. Do you know whether it was used out in the ocean?
A. Yes, it has been used out in the ocean.
Q. You said you thought it was used twice. You just told us one time out in the ocean. Do you remember where in the ocean the vessel was?
A. No, I don't remember.
Q. You remember that one of the two times it was used out in the ocean. Do you remember the other occasion when it was used?
A. No, I don't.
Q. So it possibly could have also been out in the ocean?
A. No, I don't remember.
Q. Well, possibly could have been out in the ocean?
A. Possibly.
MR. BELLANTONE: Anything is possible. Note my objection.
Q. Miss Bottega, do you know what a bareboat charter is?
A. Now I do, yes.

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JACQUELINE BOTTEGA,
Plaintiff,

VS. C.A. NO. 04-323ML

EDGAR YACHT MANAGEMENT,
INC., and LOLA MARINE,
LTD.,
Defendants.

---

LOLA MARINE, LTD.,
Third-Party Plaintiff,

VS.

J.W. KAEMPFER,
Third-Party Defendant.

DEPOSITION OF JOSEPH KAEMPFER, a Third-Party Defendant in the above-entitled cause, taken on behalf of the Defendant and Third-Party Plaintiff Lola Marine, Ltd., before Jane M. Poore, Notary Public, RPR, in and for the State of Rhode Island, at the offices of Cameron & Mittleman, 56 Exchange Terrace, Providence, Rhode Island, on January 23, 2007, at 11:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, R.I. 02920
(401) 946-5500

KAEM0000000008, if I'm correct. Do you recognize Kaempfer Exhibit 3, sir?
A. No.
Q. Do you recognize the handwriting?
A. No.
Q. Do you know who submitted that on your behalf?
A. No.
Q. Do you know what it purports to be?
A. I can read you what it says. It's called Charter's Legal Liability Request For Certificate of Insurance.
Q. Do you know, and maybe I've asked this, and we will get an objection, but do you know whether there was an application that was filled out and sent in, in order to procure the insurance on the Lola for the period of August 10 to August 20, 2001?
A. I have no recollection.
Q. There's a section that says Captain and Crew, do you see the entry?
A. Yes.
Q. Do you understand what that entry is?
A. No, other than it enumerates that there will be three people working on boat, I guess.
Q. And what does it say to the left-hand side that's

the typed material?
A. Captain and crew.
Q. And then there's a typed writer-in?
A. "Please attach crew employment contract."
Q. But there's a space for typing or writing in some information?
A. It says Captain Roger Edgar plus two.
Q. Who do you understand Captain Robert Edgar to be and the plus two to be?
MR. BRENNAN: Object to the form. You may answer.
A. Robert Edgar was the captain of the boat, and I remember his name, and the two, I presume, was for two other crew members.
Q. Thank you. Do you know if a crew employment contract was attached to this document when it was submitted?
A. I have no idea.
Q. Do you know who submitted that document to Hinckley Marine Insurance?
MR. BRENNAN: Objection, asked and answered.
A. I have no idea.
Q. Who would submit documents such as this on your behalf?

Q. And that is G-h-e-e?
A. Just G-e. She's a CPA.
Q. Where is she located?
A. In Virginia. And there are others like Susan who helped with various accounting functions. And maybe somebody at the yacht charter place.
Q. Is there anybody in particular at this yacht charter place that you remember customarily dealing with?
A. That far back, whoever I dealt with was -- I think was a gal, who is no longer there, whose name I don't remember.
Q. Do you, as you sit here today, remember the period when you chartered the Lola from August 10th to August 20, 2001?
A. Vaguely.
Q. Do you remember who was on the vessel with you?
A. Yes.
Q. Can you tell us, please, who they are?
A. Myself; my wife, Georgiana Warner; my youngest child, Luke; my father-in-law, William Warner, and David Baumunk, a friend and employee.
Q. Do any of these people presently live with you?
A. That's a delicate question. On and off my son.
Q. Do you remember the date when the plaintiff in

A. No.
Q. Was there a separate amount to pay the crew?
MR. LOVEJOY: Objection.
A. No.
Q. Did you provide Jacqueline Bottega with a W-2 form?
A. No.
Q. Did you provide Captain Edgar with a W-2 form?
A. No.
Q. You know what a W-2 form is?
A. Yes.
Q. What is a W-2 form?
A. It's what an employer gives an employee at tax time, I guess, with their earnings for the previous year and withholdings and FICA and like that.
Q. Is there any reason why you didn't provide Miss Bottega with a W-2 form?
MR. LOVEJOY: Objection.
A. She didn't work for me.
Q. And is there any reason why you didn't provide Captain Edgar with a W-2 form?
MR. LOVEJOY: Objection.
A. Because he didn't work for me.
Q. Did you ever provide Captain Edgar with a 1099

**LITTLE HARBOR**

**CREWED YACHT CHARTERS DIVISION**

TELS: 800/225-7973 – 401/683-7000 – Fax: 401/683-7029

# ~ YACHT CHARTER AGREEMENT ~

*Yacht Name:* LOLA *Type:* Aux Sail *LOA:* 78' *Flag:* USA *Doc #:* 671170

*Max # Guests Aboard: Overnight:* 6 *Day Cruising:* 12 *Number in Crew:* Capt. + 2

**Between the Undersigned Parties, it has been Agreed as follows:**

*Date of Contract:* July 6, 2001

*Owner's Name & Address:*

Lola Marine of Newport, Rhode Island, USA

*Charterer's Name & Address:*

J.W. Kaempfer of London, England

*From: Time:* 1200 *Hours* *Date:* Friday, 10 August, 2001

*To: Time:* 1200 *Hours* *Date:* Monday, 20 August, 2001

*Boarding Port:* Vinal Haven, Maine *Disembark:* Vinal Haven, Maine

## ~ Terms & Fees ~

| | | |
|---|---|---|
| *Terms:* 10 Days @ Base Rate plus all expenses: | Base Rate (US): | $ 27,140 |
| *Deposit Due:* 50% of rate – Paid by wire 6-18-01 | | $ 13,570 |
| *Balance of Rate Due:* | | $ 13,570 |
| *Plus APA (Advanced Provisioning/Expense Allowance)* | | $ 3,000 |
| TOTAL CHARTER FUNDS DUE: | By 10 July, 2001 | $ 16,570 |

DEFENDANT'S EXHIBIT 13
Edgar
tm 10/30/06

One Little Harbor Landing ■ Portsmouth, Rhode Island 02871
Phone 401-683-7000 ■ Fax 401-683-7029 ■ Website: WWW.LHYB.COM

CUSTOM YACHTS | YACHT BROKERS | MARINE SERVICES

## WITNESSETH:

### *1. DELIVERY:*

The Owner agrees to deliver the yacht in full commission and in proper working order, outfitted as a yacht of her size, type and accommodations, with full equipment, inclusive of that required by law, and fully furnished, including galley, dining utensils, bed and bath linens; staunch, clean and in good condition throughout and ready for service; and agrees to allow demurrage pro rata to the Charterer for any delay in delivery.

But should it be impossible for the Owner to make delivery as stipulated through causes beyond his control and should such a delivery not be made within 24 hours thereafter, then this Agreement may be canceled by the Charterer and in such event, any charter money paid in advance shall be refunded to him without further liability to the Owner.

### *2. INSURANCE:*

The owner represents that the yacht is insured against fire, marine and collision risks and with protection and indemnity coverage for the term of this charter, as follows subject to such deductibles, if any, as are specified below in US Dollars:

Hull: $ 1,500,000 P&I: $ 2,000,000 Deductible: $ 11,250

Said policies of insurance are to be held by the Owner. But should the Owner fail to, or elect not to carry such insurance, he shall assume the same responsibility as if the yacht were so insured.

The Owner's insurance policy does not cover the Charterer's protection and indemnity during the term of the charter. **Charterer may purchase additional Charterer's Legal Liability insurance at his own expense.**

Additional CLL insurance: *Recommended* Charterer Initial: [initials]

### *3. ACCIDENTS:*

The Owner agrees that should the yacht after delivery sustain breakdown of machinery, or be disabled, or be damaged by fire, grounding, collision, or other cause, so as to prevent the use of the yacht by the Charterer for a period of not less than 24 consecutive hours at any time, the same not being brought about by any act or default of the Charterer, the Owner shall make a pro rata return of hire to the Charterer for such period in excess of the said 24 hours that the yacht shall be disabled or unfit for use.

### *4. RUNNING EXPENSES:*

The Charterer agrees to accept the yacht delivered as hereinbefore provided, and **to pay all running** expenses during the term of the charter.

### *5. LIENS*

The Charterer, his agents and employees have no right or power to permit or suffer the creation of any maritime liens against the yacht, except for crew's wages and salvage. The Charterer agrees to indemnify the Owner for any charges or losses in connection therewith, including reasonable attorney's fees.

### *6. DRUG RESTRICTION:*

Use or possession of illegal drugs, including marijuana, on board the vessel shall result in immediate termination of the charter with forfeiture of all monies paid.

### *7. RE-DELIVERY & INDEMNIFICATION:*

The Charterer agrees to deliver the yacht, her equipment and furnishings, free and clear of any indebtedness incurred for the Charterer's account, at the expiration of this charter, to the Owner, at the agreed port, in as good condition as when delivery was taken, excepting ordinary wear and tear, and any loss or damage for which the Owner is covered by his own insurance, or the Charterer by his own insurance (if any), as set forth in Paragraphs 2 and 7 of this Agreement.

### *8. NAVIGATION LIMITS:*

The Charterer agrees to restrict the cruising of the yacht to the navigational limits as set forth in the yacht's insurance policy.

### *9. RESTRICTED USE:*

The Charterer agree that the vessel will be employed exclusively as a pleasure vessel for the sole and proper use of himself, his family, his guests and servants, during the term of this charter, and shall not transport merchandise, or carry passengers for pay, or engage in any trade, nor in any way violate the Revenue Laws of the United States, or of any other Government within the jurisdiction of which the yacht may be at any time, and shall comply with the law in all other respects.

### *10. NON-ASSIGNMENT:*

The Charterer agrees not to assign this Agreement or sub-charter the yacht without the consent of the Owner in writing.

### *11. CHARTERER'S AUTHORITY OVER CREW:*

It is mutually agreed that the full authority regarding the operation and management of the yacht is hereby transferred to the Charterer for the term thereof. In the event, however, that the Charterer wishes to utilize the services of a captain and/or crew members in connection with the operation and management of the yacht, whether said captain and/or crew members are furnished by the Owner, or by the Charterer, it is agreed that said captain and/or crew members are agents and employees of the Charterer and not the Owner.

In the event that local United States Coast Guard, or other regulations, require the Owner exclusively to provide a captain and/or crew, or the Owner agrees to provide a captain and/or crew, they must be competent not only in coastwise piloting, but in deep sea navigation. The captain shall in no way be the agent of the Owner, except that he shall handle clearance and the normal running of the yacht, subject to ports to be called at, and the general course of the voyage; but the captain will be responsible for the safe navigation of the yacht, and the Charterer shall abide by his judgment as to sailing, weather, anchorages and other pertinent matters.

The charter hire includes the services of a properly uniformed crew for the charter period, who will be selected by the Charterer, with the approval of the Owner or the Owner's Agent. Charterer is aware he has a choice of captains. After due consideration, he is hiring the Captain listed on the Yacht Employment Agreement, and will provide additional crew as outlined in same Agreement. Charterer has full right to terminate captain or crew, as they are his employees. However, replacements shall be hired as per Paragraph 11 of this Agreement.

### *12. DEFAULTS:*

It is mutually agreed that should any installment of charter money not be paid on the date designated in this Agreement, the Owner shall have the right to resume possession of the yacht and terminate this charter, without prejudice to his rights in respect of any arrears of charter money, or of any breach by the Charterer of the conditions contained herein.

*13. BROKERAGE FEES:*

The Owner and the Charterer recognize **Little Harbor Yacht Brokers** as the sole broker in connection with this Agreement, and the Owner agrees to pay said broker the mutually agreed brokerage fees in connection with said charter, including any extensions, renewals, subsequent charters, and/or in connection with the subsequent purchase of the yacht by the Charterer within a period of two years from the date of this Agreement.

It is further agreed by the Owner and the Charterer that once this Agreement has been signed by both parties, and a deposit of the charter fee has been paid, the said broker shall have no further obligation or responsibility in connection herewith to either party.

*14. CHARTERER'S CERTIFICATION:*

The Charterer (if he is to operate the yacht himself) certifies that he is experienced and competent in the handling and operation of a yacht of the type and size named in this Agreement, and that he has a sufficient practical knowledge of seamanship, piloting and Rules-of-the-Road. He agrees that he will not allow the yacht to be operated by any person not so qualified during the term of the charter.

*15. ADDITIONAL CONDITIONS:*

The parties further agree hereto that if Charterer must cancel, all monies will be forfeited unless the yacht is rebooked for the original dates reserved as per this Agreement. Refunds will be in full, or prorated according to dates rebooked, less a cancellation fee due the broker of 15% of the charter amount.

If the Owner must cancel, monies paid shall be refunded in full by the Owner to the Charterer. It is further agreed that in such an event, the Owner shall pay the broker the commission due on the full charter fee.

*16. CHARTERER'S RIGHT TO SURVEY:*

If the Charterer desires, he may request a survey of the yacht upon delivery to him, and again upon re-delivery to the Owner, and it is agreed that any such survey shall be at the Charterer's expense. However, this provision may be waived.

Charterer wishes to waive the right of survey. Charterer Initial

*17. ARBITRATION:*

Any controversy or claims arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association, said arbitration to be held in the City and State of the Owner's residence, unless another place is mutually agreed upon. Judgment upon and award reached by the Arbitrator(s) may be entered in any court of said state having jurisdiction.

*18. FURTHER AGREEMENTS:*

*It is further agreed that:*

(1) Signed facsimile copies of this contract, transmitted between the parties, are binding.
(2) There shall be no smoking below deck.
(3) There shall be no pets allowed aboard the yacht.
(4) Gratuity shall be at the Charterer's discretion.
Other:

To the true and faithful performances of the foregoing Agreement, the said parties hereto bind themselves, their heirs, executors, administrators and assigns, each to the other.

**IN WITNESS WHEREOF**, the parties hereto set their hands:

**CHARTERER:**

| | | | |
|---|---|---|---|
| J.W. Kaempfer | 7-6-01 Date | Witness | 7-6-01 Date |

**OWNER:**

| | | | |
|---|---|---|---|
| for Lola Marine, Ltd. | 7/n/01 Date | Witness | 7/19/01 Date |

## ACKNOWLEDGMENT

*When the Charterer boards the yacht, the Captain will read him the following statement with another crewman present as a witness:*

This is a bareboat charter and under the terms of a bareboat charter, you are responsible and have full and exclusive possession, command, management and operation of the vessel, as if you owned it, except that the final decision as to the safe navigation is my responsibility.

You are my Employer(s) for the term of the charter.

Charterer(s): J.W Kaempfer — 7-6-01 Date

Captain: Robert Edgar

# YACHT EMPLOYMENT AGREEMENT

**AGREEMENT** made this 6 day of July, 2001, by and betw— of London, England, Charterer of the Yacht LOLA, hereinafter Edgar of ________________, hereinafter called the Capt—

ORIGINAL

**- WITNESSETH -**

**WHEREAS,** the Charterer has under agreement the Yacht LOLA, pursuant to this bareboat agreement, wherein it is the Employer's obligation to furnish the said yacht with a competent master and crew and,

**WHEREAS,** the Captain is a competent yacht master, having had experience in coastal and inland waters of New England, Maine & the Atlantic Ocean and will furnish two (2) crew for the management and navigation of the said yacht and,

**WHEREAS,** the parties desire to reduce their agreement to written terms, therefore, in consideration of the premises and of the agreements hereinafter contained, it is agreed as follows:

1. Employer hereby hires Captain Robert Edgar as the Master of the said yacht, to act as such Master so long as the yacht is under charter to Employer.

2. Yacht captain shall be properly uniformed and the crew shall comprise of the following: Captain: Robert Edgar Chef: __________ Mate/Stew: __________

3. Yacht Captain shall be paid for his services and the services of his crew, as per this agreement and Employer shall furnish the Yacht Captain, accommodations aboard and food during the term of this agreement. Captain's wages are included in the gross charter fee quotes in the attached agreement. Crew gratuity is *not included* in the gross charter fee quoted on the attached agreement and is at the sole discretion of the Employer.

4. The terms of this agreement shall commence and terminate at the time and date pursuant to the attached Yacht Charter Agreement, unless sooner terminated by the Yacht Charter Agreement for any reason. In the event that the Yacht Charter Agreement is sooner terminated, the Captain will receive a pro-rated share of the agreed compensation for his services.

**IT WITNESS WHEREOF,** the parties have duly executed this agreement on the day indicated next to their respective signatures.

| | | |
|---|---|---|
| Employer J.W. Kaempfer | 7-6-01<br>Date | Witness |
| Captain Robert Edgar | 7/?/01<br>Date | Witness |

DEFENDANT'S EXHIBIT
Edgar 12
tm 10/20/04

08/13/04 FRI 17:21 [TX/RX NO 7542]

00022

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

-------------------------------------------------------X

JACQUELINE BOTTEGA,
Plaintiff,

v.

WILLIAM B. HALSTEAD,
EDGAR YACHT MANAGEMENT, INC., and
LOLA MARINE LTD.,
Defendants.

-------------------------------------------------------X

LOLA MARINE, LTD.,
Third-Party Plaintiff,

v.

J. W. KAEMPFER,
Third-Party Defendant

-------------------------------------------------------X

CIVIL ACTION
No. 04-323ML

[stamp] 2005

**THIRD-PARTY COMPLAINT**

Pursuant to Rule 14 (c) of the Federal Rules of Civil Procedure, defendant and third-party plaintiff, LOLA MARINE LTD. (hereafter "Lola Marine"), by its attorneys, Lovejoy & Associates, for its third-party complaint against J. W. KAEMPFER (hereafter "Kaempfer"), alleges upon information and belief as follows:

1. This is a civil case of admiralty and maritime jurisdiction within the meaning of 28 U.S.C. §1333. This is an admiralty and maritime claim within the meaning of Rules 9(h) and 14(c) of the Federal Rules of Civil Procedure.

2. That at all times hereinafter mentioned, defendant and third-party plaintiff, Lola Marine, was a domestic corporation organized under and by virtue of the laws of the State of Rhode Island with a registered place of business at One Financial Plaza, Suite 1800, Providence, Rhode Island.

4|26

negligence of her captain/crew, and for any damages or maintenance and cure owing to crew members as a result of injuries.

## AS AND FOR A FIRST CAUSE OF ACTION

13. Defendant and third-party plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 12 of this third-party complaint as if set forth at length herein and further alleges upon information and belief as follows:

14. Plaintiff's complaint seeks damages against defendant and third-party plaintiff, Lola Marine, of $5,000,000 on her first cause of action for negligence and $1,000,000 on her second cause of action for unseaworthiness. That if plaintiff was damaged as alleged, which defendant and third-party plaintiff. Lola Marine, denies, then such damage was caused while third-party defendant, Kaempfer, was in full and exclusive possession, management and control as bareboat charterer of the vessel and any such damage to plaintiff was caused by the negligence, fault or breach of the warranty of seaworthiness by the third-party defendant, Kaempfer, and was not due to the fault, error or omission of the defendant and third-party plaintiff, Lola Marine.

15. If plaintiff is found to be entitled to recover damages against defendant and third-party plaintiff, Lola Marine, on either or both of her negligence and/or unseaworthiness claims, then third-party defendant, Kaempfer, is liable to Lola Marine for full indemnity and/or contribution of its percentage share of fault in an amount to be determined at trial, together with all costs, expenses and counsel fees previously incurred to date by defendant and third-party plaintiff, Lola Marine, and its agents in defending plaintiff's action, and all costs, expenses and counsel fees that may be incurred in the future defense of this action.



7/26

## AS AND FOR A SECOND CAUSE OF ACTION

16. Defendant and third-party plaintiff, Lola Marine, repeats and re-alleges each and every allegation of paragraphs 1 through 15 of this third-party complaint as if set forth at length herein and further alleges upon information and belief as follows:

17. On August 18, 2001 and on various dates thereafter, defendant and third-party plaintiff, Lola Marine, through its underwriters, made maintenance and cure payments to plaintiff in the total amount of approximately $42,000.00. These maintenance and cure payments were made by Lola Marine's underwriters, on Lola Marine's behalf, in error and in the mistaken belief that, at the time of the alleged injury, plaintiff was a Jones Act Seaman in the employ of defendant and third-party plaintiff, Lola Marine.

18. The third cause of action of plaintiff's complaint seeks recovery against defendant and third-party plaintiff of maintenance and cure in a sum which allegedly exceeds $150,000 and the amount of which is to be determined at trial of this matter.

19. On August 18, 2001, third-party defendant, KAEMPFER, was (and remains) the responsible party for any maintenance and cure determined by this Court to be payable to plaintiff as a result of any negligence committed during the time the third-party defendant possessed, operated and controlled the vessel as bareboat charterer, or as a result of any unseaworthiness that arose on the vessel during the time that he was the bareboat charterer of the S/V/ LOLA.

20. If plaintiff was damaged as alleged, and is found entitled to maintenance and cure, which defendant and third-party plaintiff, Lola Marine, denies, then such damage was caused while third-party defendant, Kaempfer, was in full and exclusive possession, management and control as bareboat charterer of the vessel and any such damage to plaintiff was caused by the



4/26

negligence, fault or breach of the warranty of seaworthiness by the third-party defendant and was not due to the fault, error or omission of the defendant and third-party plaintiff. As bareboat charterer, third-party defendant, Kaempfer, is bound and obligated to indemnify defendant and third-party plaintiff, Lola Marine, for any and all sums to which plaintiff may be entitled for maintenance and cure, including amounts previously advanced to plaintiff on behalf of Lola Marine by its underwriters and for any and all sums ultimately held to be owing to plaintiff as maintenance and cure by this Court, together with all costs, expenses and counsel fees previously incurred to date by defendant and third-party plaintiff in defending plaintiff's action, and all costs, expenses and counsel fees that may be incurred in the future defense of this action.

WHEREFORE, defendant and third-party plaintiff Lola Marine demands;

(A) Judgment dismissing the complaint as against it together with the costs, expenses and disbursements in this action;

(B) Judgment against third-party defendant, Kaempfer, for all sums, if any, which may be adjudged against defendant and third-party plaintiff in favor of plaintiff, together with counsel fees, costs, expenses and disbursements of this action including those previously advanced and/or passed to date and those that may be incurred in future defense of this action;

(C) If the Court finds that plaintiff is entitled to any judgment, that such judgment be had directly against third-party defendant, Kaempfer, pursuant to Rule 14(c) of the Federal Rules of Civil Procedure and that third party defendant, Kaempfer, be required to answer the plaintiff's amended complaint directly;

(D) Whether or not plaintiff prevails, judgment against third-party defendant, Kaempfer, and for all counsel fees, costs and disbursements in favor of third-party plaintiff; and

(E) For such other and further relief as the Court may deem just in the premises.



9/26

Dated: Providence, Rhode Island
August 1, 2005

LOVEJOY & ASSOCIATES
Attorneys for Defendant and
Third-Party Plaintiff
LOLA MARINE, LTD.

By: [signature]
Frederick A. Lovejoy
(Bar No. 5313)
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 Telefax

BotsmaThird-PartyComplaint.doc



10/26

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JACQUELINE BOTTEGA,
Plaintiff,

v.

WILLIAM B. HALSTEAD,
EDGAR YACHT MANAGEMENT, INC., and
LOLA MARINE LTD.,
Defendants.

CIVIL ACTION
No. 04-323ML

AMENDED THIRD-PARTY COMPLAINT

LOLA MARINE, LTD.,
Third-Party Plaintiff,

v.

J. W. KAEMPFER,
Third-Party Defendant

Pursuant to Rule 14 (c) of the Federal Rules of Civil Procedure, defendant and third-party plaintiff, LOLA MARINE LTD. (hereafter "Lola Marine"), by its attorneys, Lovejoy & Associates, for its third-party complaint against J. W. KAEMPFER (hereafter "Kaempfer"), alleges upon information and belief as follows:

1. This is a civil case of admiralty and maritime jurisdiction within the meaning of 28 U.S.C. §1333. This is an admiralty and maritime claim within the meaning of Rules 9(h) and 14(c) of the Federal Rules of Civil Procedure.

2. That at all times hereinafter mentioned, defendant and third-party plaintiff, Lola Marine, was a domestic corporation organized under and by virtue of the laws of the

State of Rhode Island with a registered place of business at One Financial Plaza, Suite 1800, Providence, Rhode Island.

3. At all times hereafter mentioned, third-party defendant, Kaempfer, was and is a resident of the District of Columbia.

4. Plaintiff has brought an action against defendant Lola Marine, among others, to recover for personal injuries she allegedly suffered while serving as a crewmember aboard the S/V LOLA on August 18, 2001. A true and complete copy of the amended complaint, dated August 13, 2004, is attached hereto as Exhibit A.

5. On August 18, 2001, defendant Lola Marine was the registered owner of the S/V LOLA.

6. On July 6, 2001, third-party defendant, Kaempfer, as charterer, entered a Yacht Charter Agreement (hereafter "Charter Agreement"), with defendant and third-party plaintiff, Lola Marine, as owner, of the S/V LOLA. A true and complete copy of the Charter Agreement is attached hereto as Exhibit B. The Charter Agreement provided that the charter period of the S/V LOLA was to run from twelve noon on Friday, August 10, 2001 through twelve noon on Monday, August 20, 2001.

7. Pursuant to the Acknowledgement contained at the end of the Charter Agreement, third-party defendant, Kaempfer, expressly acknowledged that the charter he was entering was a "bareboat charter" and that, under the terms of the bareboat charter, he was responsible during the period of the bareboat charter, and had full and exclusive possession, command, management and operation of the vessel as if he owned it, except as to decisions relating to safe navigation which were reserved as the responsibility of the S/V LOLA's captain.

8. On July 6, 2001, third-party defendant, Kaempfer, also entered into a separate agreement entitled "Yacht Employment Agreement" (hereafter "Employment Agreement"). Kaempfer, as employer, entered the Employment Agreement with co-defendant, Robert Edgar, as captain of the S/V LOLA. Pursuant to the first "WHEREAS" clause of the Employment Agreement, third-party defendant, Kaempfer, further acknowledged that it was his responsibility to furnish the S/V LOLA with a competent master and crew during the term of the charter. A true and complete copy of the Employment Agreement is attached hereto as Exhibit C.

9. Pursuant to the foregoing Charter Agreement and/or Employment Agreement, third-party defendant, Kaempfer, took full and exclusive possession, management and control of the vessel as of twelve noon on August 10, 2001. On August 18, 2001, the date plaintiff allegedly suffered her injuries, the S/V LOLA was in the full and exclusive possession, command, management and control of the third-party defendant, Kaempfer.

10. Pursuant to the Employment Agreement, Robert Edgar and/or Jacqueline Bottega were employees of Kaempfer on August 18, 2001.

11. Pursuant to "Paragraph 2. INSURANCE" of the Charter Agreement, third-party defendant, Kaempfer, specifically agreed that the Owner's insurance policy did not cover Charterer's protection and indemnity and agreed that Charterer would purchase additional Charterer's Legal Liability Insurance at his own expense.

12. On August 18, 2001, the date plaintiff allegedly suffered her injuries, plaintiff was not employed by defendant and third-party plaintiff, Lola Marine. Lola Marine never acted as plaintiff's employer.

13. On August 18, 2001, the date plaintiff allegedly suffered her injuries, third-party defendant, Kaempfer, was the bareboat charterer of the S/V LOLA and thereby "stepped into the shoes" of the owner/defendant and third-party plaintiff, Lola Marine and became responsible for any and all injuries and damages suffered by the crew due to any unseaworthiness of the vessel, negligence of her captain/crew, and for any damages or maintenance and cure owing to crew members as a result of injuries.

AS AND FOR A FIRST CAUSE OF ACTION

14. Defendant and third-party plaintiff repeats and re-alleges each and every allegation of paragraphs 1 through 13 of this amended third-party complaint as if set forth at length herein and further alleges upon information and belief as follows:

15. Plaintiff's complaint seeks damages against defendant and third-party plaintiff, Lola Marine, of $5,000,000.00 on her first cause of action for negligence and $1,000,000.00 on her second cause of action for unseaworthiness. That if plaintiff was damaged as alleged, which defendant and third-party plaintiff, Lola Marine, denies, then such damage was caused while third-party defendant, Kaempfer, was in full and exclusive possession, management and control as bareboat charterer of the vessel and any such damage to plaintiff was caused by the negligence, fault or breach of the warranty of seaworthiness by the third-party defendant, Kaempfer, and was not due to the fault, error or omission of the defendant and third-party plaintiff, Lola Marine.

16. If plaintiff is found to be entitled to recover damages against defendant and third-party plaintiff, Lola Marine, on either or both of her negligence and/or unseaworthiness claims, then third-party defendant, Kaempfer, is liable to Lola Marine for full indemnity and/or contribution of its percentage share of fault in an amount to be

determined at trial, together with all costs, expenses and counsel fees previously incurred to date by defendant and third-party plaintiff, Lola Marine, and its agents in defending plaintiff's action, and all costs, expenses and counsel fees that may be incurred in the future defense of this action.

AS AND FOR A SECOND CAUSE OF ACTION

17. Defendant and third-party plaintiff, Lola Marine, repeats and re-alleges each and every allegation of paragraphs 1 through 16 of this amended third-party complaint as if set forth at length herein and further alleges upon information and belief as follows:

18. On August 18, 2001 and on various dates thereafter, defendant and third-party plaintiff, Lola Marine, through its underwriters, made maintenance and cure payments to plaintiff in the total amount of approximately $42,000.00. These maintenance and cure payments were made by Lola Marine's underwriters, on Lola Marine's behalf, in error and in the mistaken belief that, at the time of the alleged injury, plaintiff was a Jones Act Seaman in the employ of defendant and third-party plaintiff, Lola Marine.

19. The third cause of action of plaintiff's complaint seeks recovery against defendant and third-party plaintiff of maintenance and cure in a sum which allegedly exceeds $150,000.00 and the amount of which is to be determined at trial of this matter.

20. On August 18, 2001, third-party defendant, KAEMPFER, was (and remains) the responsible party for any maintenance and cure determined by this Court to be payable to plaintiff as a result of any negligence committed during the time the third-

party defendant possessed, operated and controlled the vessel as bareboat charterer, or as a result of any unseaworthiness that arose on the vessel during the time that he was the bareboat charterer of the S/V/ LOLA.

21. If plaintiff was damaged as alleged, and is found entitled to maintenance and cure, which defendant and third-party plaintiff, Lola Marine, denies, then such damage was caused while third-party defendant, Kaempfer, was in full and exclusive possession, management and control as bareboat charterer of the vessel and any such damage to plaintiff was caused by the negligence, fault or breach of the warranty of seaworthiness by the third-party defendant and was not due to the fault, error or omission of the defendant and third-party plaintiff. As bareboat charterer, third-party defendant, Kaempfer, is bound and obligated to indemnify defendant and third-party plaintiff, Lola Marine, for any and all sums to which plaintiff may be entitled for maintenance and cure, including amounts previously advanced to plaintiff on behalf of Lola Marine by its underwriters and for any and all sums ultimately held to be owing to plaintiff as maintenance and cure by this Court, together with all costs, expenses and counsel fees previously incurred to date by defendant and third-party plaintiff in defending plaintiff's action, and all costs, expenses and counsel fees that may be incurred in the future defense of this action.

AS AND FOR A THIRD CAUSE OF ACTION

22. Defendant and third-party plaintiff, Lola Marine, repeats and re-alleges each and every allegation of paragraphs 1 through 21 of this amended third-party complaint as if set forth at length herein and further alleges upon information and belief as follows:

23. That Robert Edgar was an employee of J.W. Kaempfer on August 18, 2001.

24. That on August 18, 2001, if plaintiff Jacqueline Bottega was injured as the result of the alleged negligence of Robert Edgar, then the Third-Party defendant; Kaempfer, is liable for plaintiff Jacqueline Bottega's damages pursuant to the doctrine of respondeat superior.

WHEREFORE, defendant and third-party plaintiff Lola Marine demands:

(A) Judgment dismissing the complaint as against it together with the costs, expenses and disbursements in this action;

(B) Judgment against third-party defendant, Kaempfer, for all sums, if any, which may be adjudged against defendant and third-party plaintiff in favor of plaintiff, together with counsel fees, costs, expenses and disbursements of this action including those previously advanced and/or passed to date and those that may be incurred in future defense of this action;

(C) If the Court finds that plaintiff is entitled to any judgment, that such judgment be had directly against third-party defendant, Kaempfer, pursuant to Rule 14(c) of the Federal Rules of Civil Procedure and that third party defendant, Kaempfer, be required to answer the plaintiff's amended complaint directly;

(D) Whether or not plaintiff prevails, judgment against third-party defendant, Kaempfer, and for all counsel fees, costs and disbursements in favor of third-party plaintiff; and

(E) For such other and further relief as the Court may deem just in the premises.

Dated: Providence, Rhode Island
January 20, 2006

LOVEJOY & ASSOCIATES
Attorneys for Defendant and
Third-Party Plaintiff
LOLA MARINE, LTD.

By: ____________________
Frederick A. Lovejoy
(Bar No. 5313)
1536 Westminster Street
Providence, Rhode Island 02909
(401) 273-7747
(401) 273-4818 Telefax

# Exhibit A

COPY

Justin T. Shay (#2781)
Charles S. Beal (#5559)
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(401) 331-5700

FILED AUG 17 2005 U.S. DISTRICT COURT DISTRICT OF RHODE ISLAND

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

C.A. No. 04-323ML

JAQUELINE BOTTEGA,

Plaintiff,

-against-

WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT INC and LOLA MARINE LTD.,

Defendants.

PLAINTIFF DEMANDS A TRIAL BY JURY

AMENDED COMPLAINT

SEAMAN'S CASE UNDER THE JONES ACT FOR PERSONAL INJURIES

SUITS UNDER SPECIAL RULE FOR SEAMEN TO SUE WITHOUT SECURITY OR PREPAYMENT OF FEES FOR THE ENFORCEMENT OF THE LAWS OF THE UNITED STATES, COMMON AND STATUTORY, FOR THE PROTECTION AND HEALTH AND SAFETY OF SEAMEN AT SEA PURSUANT TO 28 USC 1916

Plaintiff, JAQUELINE BOTTEGA, by her attorneys CAMERON & MITTLEMAN, LLP, complaining of the defendants, WILLIAM B. HALSTEAD, EDGAR YACHT MANAGEMENT INC and LOLA MARINE LTD., respectfully state and allege upon information and belief as follows:

## AS FOR THE FIRST CAUSE OF ACTION ON BEHALF OF PLAINTIFF: JAQUELINE BOTTEGA

FIRST: Plaintiff, JAQUELINE BOTTEGA, is a resident and citizen of the State of New York.

SECOND: Defendant, EDGAR YACHT MANAGEMENT INC, is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

THIRD: Upon information and belief, Defendant, WILLIAM B. HALSTEAD, is a resident and citizen of the State of Rhode Island.

FOURTH: Defendant, LOLA MARINE LTD., is a domestic corporation engaged in the operation of yachts and other assorted vessels and does business in the State of Rhode Island.

FIFTH: This action is brought under the Admiralty Law as modified by the Jones Act, 46 U.S.C. § 688, and the Court's Admiralty and Maritime Jurisdiction pursuant to 28 U.S.C. § 1333. Nothing in these jurisdictional allegations is to be construed as a waiver of the plaintiff's right to a jury trial in plaintiff's action at law under the Jones Act, nor of the right to have all of the claims asserted herein tried to a jury, at plaintiff's option

SIXTH: At all times material hereto defendant, WILLIAM B.HALSTEAD was the captain of the vessel known as LOLA.

SEVENTH: At all times material hereto defendant, WILLIAM B. HALSTEAD, managed and maintained the vessel LOLA.

EIGHTH: At all times material hereto defendant, WILLIAM B. HALSTEAD, operated and controlled the vessel LOLA.

<u>NINTH:</u> At all times material hereto defendant, WILLIAM B. HALSTEAD, owned the vessel LOLA.

<u>TENTH:</u> At all times material hereto defendant, WILLIAM B. HALSTEAD, hired the crew of the vessel LOLA.

<u>ELEVENTH:</u> At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, managed and maintained the vessel LOLA.

<u>TWELFTH:</u> At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, operated and controlled the vessel LOLA.

<u>THIRTEENTH:</u> At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC, owned the vessel LOLA.

<u>FOURTEENTH:</u> At all times material hereto defendant, EDGAR YACHT MANAGEMENT INC., hired the crew of vessel LOLA.

<u>FIFTEENTH:</u> At all times material hereto defendant, LOLA MARINE LTD., managed and maintained the vessel LOLA.

<u>SIXTEENTH:</u> At all times material hereto defendant, LOLA MARINE, LTD, operated and controlled the vessel LOLA.

<u>SEVENTEENTH:</u> At all times material hereto defendant, LOLA MARINE LTD, owned the vessel LOLA.

<u>EIGHTEENTH:</u> At all times material hereto defendant, LOLA MARINE LTD, hired the crew of vessel LOLA.

<u>NINETEENTH:</u> On August 18, 2001, and at all times mentioned herein, Plaintiff was employed as a member of the crew of vessel LOLA.

<u>TWENTIETH</u>: On August 18, 2001, and at all times mentioned herein, Plaintiff was an employee of WILLIAM HALSTEAD.

<u>TWENTY-FIRST</u>: On August 18, 2001, and at all times hereinafter mentioned, Plaintiff was an employee of LOLA MARINE LTD.

<u>TWENTY-SECOND</u>: On August 18, 2001, Plaintiff was an employee of EDGAR YACHT MANAGEMENT INC.

<u>TWENTY-THIRD</u>: On August 18, 2001; while vessel LOLA, was operating in United States territorial waters, Plaintiff, JAQUELINE BOTTEGA, in the course of her employment, pursuant to orders, and while in the performance of her duties, because of the unsafe and unseaworthy condition of the vessel and the negligence of the defendants, was caused to sustain serious and permanent injuries.

<u>TWENTY-FOURTH</u>: Plaintiff's, JAQUELINE BOTTEGA, injuries were caused by the negligence of the defendants, by their agents, servants, workmen, and employees, by the unseaworthiness of the vessel, and by the defendants' breach of its obligation under the circumstances including its obligation to provide a safe and seaworthy vessel.

<u>TWENTY-FIFTH</u>: Plaintiff's injuries were sustained solely by reason of the negligence of the defendants and the defendant's agents, servants and employees and the actions of plaintiff did not contribute in any way to the injuries sustained.

<u>TWENTY-SIXTH</u>: At the time Plaintiff, JAQUELINE BOTTEGA, entered defendant's employ, she was a strong, robust and able-bodied person with a substantial earning capacity and prospects of advancement in earning capacity.

TWENTY-SEVENTH: As a consequence of the negligence of the defendants as aforesaid, the plaintiff suffered unnecessary, severe and permanent injuries as well as severe mental anguish, shock, pain, disability and reduced earning capacity.

TWENTY-EIGHTH: Plaintiff makes a claim for the economic value of her normal life expectancy all to her damage in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

AS FOR THE SECOND CAUSE OF ACTION ON BEHALF
OF PLAINTIFF: JAQUELINE BOTTEGA

TWENTY-NINTH: The plaintiff repeats and re-alleges each every allegation of the First Cause of Action of the complaint as if fully set forth herein.

THIRTIETH: That on August 18, 2001, plaintiff was injured while employed as a crew member of the vessel LOLA by reason of the unseaworthiness of said vessel, without any negligence on part of the plaintiff contributing thereto..

THIRY-FIRST: That as a result of the foregoing, the plaintiff was rendered sick, sore, lame and disabled, and sustained severe permanent personal injuries and was prevented from attending her daily labors, thereby losing sums of money which she otherwise would have earned as wages, and has endeavored to be cured of her injuries, and has expended sums of money to maintain herself, and will continue to endure pain and suffering to all her damage.

THIRTY-SECOND: That by reason of the foregoing, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000) DOLLARS.

//

AS FOR THE THIRD CAUSE OF ACTION ON BEHALF
OF PLAINTIFF: JAQUELINE BOTTEGA:

THIRTY-THIRD: That the Plaintiff repeats and realleges all of the foregoing paragraphs of the complaint with the same force and effect as if herein set forth at length.

THIRTY-FOURTH: That it was the duty of the defendant to provide the plaintiff with the expenses of her maintenance and cure.

THIRTY-FIFTH: That the plaintiff became disabled as heretofore described, but the defendant failed, neglected and refused to furnish the plaintiff with the expenses of his maintenance and cure, all to her damage in a sum, which exceeds ONE HUNDRED FIFTY THOUSAND ($150,000.00) DOLLARS, or in an amount to be determined at a trial of this matter.

W H E R E F O R E: Plaintiff prays that judgment be entered against the defendants in the amount of FIVE MILLION ($5,000,000.00) DOLLARS for the First Cause of Action, FIVE MILLION ($5,000,000.00) DOLLARS for the Second Cause of Action, and ONE HUNDRED AND FIFTY THOUSAND ($150,000.00) DOLLARS for the Third Cause of Action and.

Dated: August 13, 2004

Yours, etc.,

Justin T. Shay (#2781)
Charles S. Beal(#5559)
Cameron & Mittleman, LLP
56 Exchange Terrace
Providence, RI 02903
(401) 331-5700

Gregory D. Bellantone- Of Counsel
Edelman, Krasin & Jaye, PLLC
One Old Country Road – Suite 210
Carle Place, New York 11514
(516) 742-9200
(516) 742-7622 fax

JURY DEMAND
Plaintiff demands a trial by jury.

Exhibit B

LITTLE HARBOR

CREWED YACHT CHARTERS DIVISION
TELS: 800/225-7973 ~ 401/683-7000 ~ Fax: 401/683-7029

# ~ YACHT CHARTER AGREEMENT ~

*Yacht Name:* LOLA *Type:* Aux Sail *LOA:* 78' *Flag:* USA *Doc #:* 671170

*Max # Guests Aboard: Overnight:* 6 *Day Cruising:* 12 *Number in Crew:* Capt. + 2

Between the Undersigned Parties, it has been Agreed as follows:

*Date of Contract:* July 6, 2001

*Owner's Name & Address:*

Lola Marine of Newport, Rhode Island, USA

ORIGINAL

*Charterer's Name & Address:*

J.W. Kaempfer of London, England

*From: Time:* 1200 *Hours* *Date:* Friday, 10 August, 2001

*To: Time:* 1200 *Hours* *Date:* Monday, 20 August, 2001

*Boarding Port:* Vinal Haven, Maine *Disembark:* Vinal Haven, Maine

~ Terms & Fees ~

| | | |
|---|---|---|
| *Terms:* 10 Days @ Base Rate plus all expenses: | Base Rate (US): | $ 27,140 |
| *Deposit Due:* 50% of rate -- Paid by wire 6-18-01 | | $ 13,570 |
| *Balance of Rate Due:* | | $ 13,570 |
| *Plus APA (Advanced Provisioning/Expense Allowance)* | | $ 3,000 |
| TOTAL CHARTER FUNDS DUE: | By 10 July, 2001 | /$ 16,570 |

One Little Harbor Landing • Portsmouth, Rhode Island 02871
Phone 401-683-7000 • Fax 401-683-7029 • Website: WWW.LHYB.COM

CUSTOM YACHTS | YACHT BROKERS | MARINE SERVICES

WITNESSETH:

*1. DELIVERY:*

The Owner agrees to deliver the yacht in full commission and in proper working order, outfitted as a yacht of her size, type and accommodations, with full equipment, inclusive of that required by law, and fully furnished, including galley, dining utensils, bed and bath linens; staunch, clean and in good condition throughout and ready for service; and agrees to allow demurrage pro rata to the Charterer for any delay in delivery.

But should it be impossible for the Owner to make delivery as stipulated through causes beyond his control and should such a delivery not be made within 24 hours thereafter, then this Agreement may be canceled by the Charterer and in such event, any charter money paid in advance shall be refunded to him without further liability to the Owner.

*2. INSURANCE:*

The owner represents that the yacht is insured against fire, marine and collision risks and with protection and indemnity coverage for the term of this charter, as follows subject to such deductibles, if any, as are specified below in US Dollars:

Hull: $ 1,500,000 P&I $ 2,000,000 Deductible: $ 11,250

Said policies of insurance are to be held by the Owner. But should the Owner fail to, or elect not to carry such insurance, he shall assume the same responsibility as if the yacht were so insured.

The Owner's insurance policy does not cover the Charterer's protection and indemnity during the term of the charter. Charterer may purchase additional Charterer's Legal Liability insurance at his own expense.

Additional CLL insurance: *Recommended* Charterer Initial: [initials]

*3. ACCIDENTS:*

The Owner agrees that should the yacht after delivery sustain breakdown of machinery, or be disabled, or be damaged by fire, grounding, collision, or other cause, so as to prevent the use of the yacht by the Charterer for a period of not less than 24 consecutive hours at any time, the same not being brought about by any act or default of the Charterer, the Owner shall make a pro rata return of hire to the Charterer for such period in excess of the said 24 hours that the yacht shall be disabled or unfit for use.

*4. RUNNING EXPENSES:*

The Charterer agrees to accept the yacht delivered as hereinbefore provided, and to pay all running expenses during the term of the charter.

*5. LIENS*

The Charterer, his agents and employees have no right or power to permit or suffer the creation of any maritime liens against the yacht, except for crew's wages and salvage. The Charterer agrees to indemnify the Owner for any charges or losses in connection therewith, including reasonable attorney's fees.

*6. DRUG RESTRICTION:*

Use or possession of illegal drugs, including marijuana, on board the vessel shall result in immediate termination of the charter with forfeiture of all monies paid.

*7. RE-DELIVERY & INDEMNIFICATION:*

The Charterer agrees to deliver the yacht, her equipment and furnishings, free and clear of any indebtedness incurred for the Charterer's account, at the expiration of this charter, to the Owner, at the agreed port, in as good condition as when delivery was taken, excepting ordinary wear and tear, and any loss or damage for which the Owner is covered by his own insurance, or the Charterer by his own insurance (if any), as set forth in Paragraphs 2 and 7 of this Agreement.

*8. NAVIGATION LIMITS:*

The Charterer agrees to restrict the cruising of the yacht to the navigational limits as set forth in the yacht's insurance policy.

*9. RESTRICTED USE:*

The Charterer agree that the vessel will be employed exclusively as a pleasure vessel for the sole and proper use of himself, his family, his guests and servants, during the term of this charter, and shall not transport merchandise, or carry passengers for pay, or engage in any trade, nor in any way violate the Revenue Laws of the United States, or of any other Government within the jurisdiction of which the yacht may be at any time, and shall comply with the law in all other respects

*10. NON-ASSIGNMENT:*

The Charterer agrees not to assign this Agreement or sub-charter the yacht without the consent of the Owner in writing.

*11. CHARTERER'S AUTHORITY OVER CREW:*

It is mutually agreed that the full authority regarding the operation and management of the yacht is hereby transferred to the Charterer for the term thereof. In the event, however, that the Charterer wishes to utilize the services of a captain and/or crew members in connection with the operation and management of the yacht, whether said captain and/or crew members are furnished by the Owner, or by the Charterer, it is agreed that said captain and/or crew members are agents and employees of the Charterer and not the Owner.

In the event that local United States Coast Guard, or other regulations, require the Owner exclusively to provide a captain and/or crew, or the Owner agrees to provide a captain and/or crew, they must be competent not only in coastwise piloting, but in deep sea navigation. The captain shall in no way be the agent of the Owner, except that he shall handle clearance and the normal running of the yacht, subject to ports to be called at, and the general course of the voyage; but the captain will be responsible for the safe navigation of the yacht, and the Charterer shall abide by his judgment as to sailing, weather, anchorages and other pertinent matters.

The charter hire includes the services of a properly uniformed crew for the charter period, who will be selected by the Charterer, with the approval of the Owner or the Owner's Agent. Charterer is aware he has a choice of captains. After due consideration, he is hiring the Captain listed on the Yacht Employment Agreement, and will provide additional crew as outlined in same Agreement. Charterer has full right to terminate captain or crew, as they are his employees. However, replacements shall be hired as per Paragraph 11 of this Agreement.

*12. DEFAULTS:*

It is mutually agreed that should any installment of charter money not be paid on the date designated in this Agreement, the Owner shall have the right to resume possession of the yacht and terminate this charter, without prejudice to his rights in respect of any arrears of charter money, or of any breach by the Charterer of the conditions contained herein.

*13. BROKERAGE FEES:*

The Owner and the Charterer recognize Little Harbor Yacht Brokers as the sole broker in connection with this Agreement, and the Owner agrees to pay said broker the mutually agreed brokerage fees in connection with said charter, including any extensions, renewals, subsequent charters, and/or in connection with the subsequent purchase of the yacht by the Charterer within a period of two years from the date of this Agreement.

It is further agreed by the Owner and the Charterer that once this Agreement has been signed by both parties, and a deposit of the charter fee has been paid, the said broker shall have no further obligation or responsibility in connection herewith to either party.

*14. CHARTERER'S CERTIFICATION:*

The Charterer (if he is to operate the yacht himself) certifies that he is experienced and competent in the handling and operation of a yacht of the type and size named in this Agreement, and that he has a sufficient practical knowledge of seamanship, piloting and Rules-of-the-Road. He agrees that he will not allow the yacht to be operated by any person not so qualified during the term of the charter.

*15. ADDITIONAL CONDITIONS:*

The parties further agree hereto that if Charterer must cancel, all monies will be forfeited unless the yacht is rebooked for the original dates reserved as per this Agreement. Refunds will be in full, or prorated according to dates rebooked, less a cancellation fee due the broker of 15% of the charter amount.

If the Owner must cancel, monies paid shall be refunded in full by the Owner to the Charterer. It is further agreed that in such an event, the Owner shall pay the broker the commission due on the full charter fee.

*16 CHARTERER'S RIGHT TO SURVEY:*

If the Charterer desires, he may request a survey of the yacht upon delivery to him, and again upon re-delivery to the Owner, and it is agreed that any such survey shall be at the Charterer's expense. However, this provision may be waived.

Charterer wishes to waive the right of survey. Charterer Initial

*17. ARBITRATION:*

Any controversy or claims arising out of, or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association, said arbitration to be held in the City and State of the Owner's residence, unless another place is mutually agreed upon. Judgment upon and award reached by the Arbitrator(s) may be entered in any court of said state having jurisdiction.

*18. FURTHER AGREEMENTS:*

*It is further agreed that:*

(1) Signed facsimile copies of this contract, transmitted between the parties, are binding.
(2) There shall be no smoking below deck.
(3) There shall be no pets allowed aboard the yacht.
(4) Gratuity shall be at the Charterer's discretion.
Other:

To the true and faithful performances of the foregoing Agreement, the said parties hereto bind themselves, their heirs, executors, administrators and assigns, each to the other.

IN WITNESS WHEREOF, the parties hereto set their hands:

CHARTERER:

| | | | |
|---|---|---|---|
| J.W. Kaempfer | 7-6-01 | Witness | 7-6-01 |
| | Date | | Date |

SIGN HERE

OWNER:

| | | | |
|---|---|---|---|
| for Lola Marine, Ltd. | 7/11/01 | Witness | 7/19/01 |
| | Date | | Date |

---

ACKNOWLEDGMENT

*When the Charterer boards the yacht, the Captain will read him the following statement with another crewman present as a witness:*

This is a bareboat charter and under the terms of a bareboat charter, you are responsible and have full and exclusive possession, command, management and operation of the vessel, as if you owned it, except that the final decision as to the safe navigation is my responsibility.

You are my Employer(s) for the term of the charter.

Charterer(s): J.W. Kaempfer [redacted] -6-01
Date

Captain: Edge

# Exhibit C

# YACH... IPLOYMENT AGREEMEN...

AGREEMENT made this 6 day of July, 2001, by and betw...
of London, England, Charterer of the Yacht LOLA, hereinafter
Edgar of ______________, hereinafter called the Capt...

ORIGINAL

~ WITNESSETH ~

WHEREAS, the Charterer has under agreement the Yacht LOLA, pursuant to this bareboat agreement, wherein it is the Employer's obligation to furnish the said yacht with a competent master and crew and,

WHEREAS, the Captain is a competent yacht master, having had experience in coastal and inland waters of New England, Maine & the Atlantic Ocean and will furnish two (2) crew for the management and navigation of the said yacht and,

WHEREAS, the parties desire to reduce their agreement to written terms, therefore, in consideration of the premises and of the agreements hereinafter contained, it is agreed as follows:

1. Employer hereby hires Captain Robert Edgar as the Master of the said yacht, to act as such Master so long as the yacht is under charter to Employer.

2. Yacht captain shall be properly uniformed and the crew shall comprise of the following: Captain: Robert Edgar Chef: ______________ Mate/Stew: ______________

3. Yacht Captain shall be paid for his services and the services of his crew, as per this agreement and Employer shall furnish the Yacht Captain, accommodations aboard and food during the term of this agreement. Captain's wages are included in the gross charter fee quotes in the attached agreement. Crew gratuity is *not included* in the gross charter fee quoted on the attached agreement and is at the sole discretion of the Employer.

4. The terms of this agreement shall commence and terminate at the time and date pursuant to the attached Yacht Charter Agreement, unless sooner terminated by the Yacht Charter Agreement for any reason. In the event that the Yacht Charter Agreement is sooner terminated, the Captain will receive a pro-rated share of the agreed compensation for his services.

IT WITNESS WHEREOF, the parties have duly executed this agreement on the day indicated next to their respective signatures.

| | | |
|---|---|---|
| Employer J.W. Kaempfer | 7-6-01<br>Date | Witness |
| Captain Robert Edgar | 7/6/01<br>Date | Witness |

# CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was mailed on January 20, 2006, postage prepaid, to:

Justin T. Shay, Esq.
Cameron & Mittleman
56 Exchange Terrace
Providence, RI 02903

Gregory D. Bellantone, Esq.
Edelman, Krasin & Jaye, PLLC
Suite 210
One Old country Road
Carle Place, NY 11514

Norman A Peloquin, II, Esq.
Saunders & Saunders, LLP
700 Pleasant Street
New Bedford, Massachusetts 02740

J.W. Kaempfer
c/o Lawrence Brennan, Esq.
Wilson Elser Moskowitz Edelman & Dicker
150 E 42nd Street Floor 19
New York, New York 10017-5639

J.W. Kaempfer
C/o The Kaempfer Co.
1501 K Street, N.W., Suite 300
Washington, D.C. 20005

Frederick A. Lovejoy